## VICTORIA SOGG, Appellant, v. NEVADA STATE BANK, Executor for the Estate of PAUL B. SOGG, Deceased, Respondent.

No. 20724

May 13, 1992 832 P.2d 781

[Rehearing denied August 5, 1992]

*Beckley, Singleton, DeLanoy, Jemison & List* and *Daniel F. Polsenberg,* Las Vegas; *Frances-Ann Fine,* Las Vegas, for Appellant.

*Lionel Sawyer & Collins* and *Mark A. Solomon,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

Victoria Sogg (Vicky) and Paul Sogg (Paul) met between 1972 and 1974, when both were married to other people. Paul was a successful general contractor, engaged in the business of acquiring and developing real estate. Vicky had been a professional country singer following her graduation from high school. In 1981, she left Las Vegas for Europe, where she was sporadically employed by her brother's company demonstrating wireless telephones to potential customers in various countries. While in

Europe, Vicky also participated in DeForest, Inc., a partnership allegedly established to capitalize on differences in monetary exchange rates. Her participation in this partnership required an investment of $265,000, which she raised by securing a second mortgage on her house in Sherman Oaks, California, wrapped with a mortgage on her sister's house. Vicky returned to the United States in 1986, when the bank threatened to foreclose on the houses. She never received a return on her investment and was eventually unable to locate her "partners." She was told that the partnership went bankrupt in January of 1987, although she never received any documents to that effect and never consulted an attorney.

Vicky and Paul began dating in early 1987. Vicky was approximately fifty-five years old at the time, and Paul was approximately eighty-seven. Paul was divorced and Vicky was separated from her husband, Robert Fletcher (Fletcher). In April of 1987, Paul asked Vicky to marry him, and she obtained a divorce from Fletcher, which was paid for by Paul.

Prior to their marriage, Vicky was aware that Paul was a wealthy man. However, Vicky was never specifically informed of Paul's net worth, which was approximately twenty million dollars. Paul testified that prior to their wedding, he was aware that Vicky did not have substantial financial resources, but he believed Vicky was expecting to receive five million dollars from her European business venture.

The day before Paul and Vicky were to be married, Paul took Vicky to the office of his attorney, Mr. Avila (Avila), to sign a premarital agreement. Vicky testified that she was not given a copy of the agreement to read at the time. Avila told Vicky that she should review the agreement with her own attorney, and he took her to see a Mr. Cox (Cox), an attorney whose office was down the hall from Avila's. Avila had already arranged an appointment for Vicky with Cox. Cox met with Vicky alone and began reading parts of the agreement to her. He testified that she immediately had questions concerning certain provisions requiring her to return various items of jewelry that Paul had given her. After approximately twenty to thirty minutes, before Vicky and Cox had finished reviewing the agreement and before Cox had had the opportunity to offer Vicky his advice, Paul entered Cox's office unannounced. Paul testified that Cox and Vicky had been talking for an hour, and he wanted to know what was taking so long. Paul and Vicky began to argue and then left Cox's office, with Vicky in tears. At the time the couple left Cox's office, Paul was aware that Vicky was upset about provisions in the agreement concerning the jewelry he had given her and the payments he had made on her house, as well as the lack of a provision for her living expenses in the event of a divorce.

After the meeting in Cox's office, Paul called off the wedding and he and Vicky stopped talking to each other. Vicky returned the jewelry and the car that Paul had given to her. Several weeks later, the parties reconciled, and a new wedding date was set. Because the parties were in a hurry to get married prior to the date of their prearranged honeymoon, they did not discuss the premarital agreement again until shortly before the wedding. Vicky testified that she and Paul went to Avila's office to sign the agreement the day before their wedding. Avila was not present, but Paul and Vicky both signed the agreement in the presence of Avila's secretary. Vicky testified that she did not read the agreement at that time because Paul had told her that he had not had the opportunity to make any changes. In fact, she testified that she never actually read the document until after the marriage and honeymoon. Rather, Vicky testified that she signed the agreement because Paul promised her that he would amend it when they returned from their honeymoon, to provide for her house in California and to allow her to keep the jewelry, furs, and car he had given her. Although an addendum to the agreement was eventually drafted, it was never signed by the parties.

Sometime after Vicky and Paul signed the premarital agreement and subsequent to the parties' marriage, Avila requested that Cox sign the attorney's certificate stating that he had counseled Vicky with respect to the agreement. Cox refused to sign the certificate after the marriage had taken place because he felt it would be misleading under the circumstances. Furthermore, Cox testified that he had not even seen the complete agreement prior to the parties' marriage, because the copy he had received did not contain any of the financial documents referred to as "attachments" in the agreement. Later, after Paul had initiated the divorce action, a second attorney, Mr. Swanson (Swanson), was also asked to review the agreement on Vicky's behalf. Swanson met once with both Paul and Vicky, but they never had the opportunity to review the entire agreement. Swanson's copy of the agreement was also missing the financial attachments, and he also refused to give his approval to the agreement.

Paul filed for divorce approximately eight months after the parties' marriage. The district court bifurcated the divorce action. During the first phase of the proceedings, the district court upheld the validity of the premarital agreement, finding that it had been voluntarily and knowingly entered into by both parties and that it was not unconscionable as a matter of law. During the second phase of the proceedings, the district court found that the jewelry, furs, and car given to Vicky by Paul were not gifts but were only for her use during the marriage, and that the mortgage payments he made on her house were a loan.

This court may review the validity of a premarital agreement de novo. Buettner v. Buettner, 89 Nev. 39, 45, 505 P.2d 600, 604 (1973). *See also* NRS 123A.080(3). Because the premarital agreement in the instant case was adopted prior to this state's adoption of the Uniform Premarital Agreements Act (UPAA), this agreement will be found to be enforceable if it either conforms to the requirements of the UPAA or if it conforms to the common law, as interpreted by the courts of Nevada prior to enactment of the UPAA. *See* NRS 123A.010, Reviser's Note.

We have previously held premarital agreements to be enforceable unless "unconscionable, obtained through fraud, misrepresentation, material nondisclosure or duress." *Buettner,* 89 Nev. at 45, 505 P.2d at 604. Other jurisdictions have held such agreements to similar standards. Because of the presumed fiduciary relationship existing between parties who are engaged to be married, a presumption of fraud has been found where the agreement entered into greatly disfavors one of the parties. Bauer v. Bauer, 464 P.2d 710, 711 (Or.App. 1970); Matter of Marriage of Matson, 730 P.2d 668, 671 (Wash. 1986). This presumption may be overcome by a showing that the party claiming disadvantage was not in fact disadvantaged. Factors to consider include whether the disadvantaged party (1) had ample opportunity to obtain the advice of an independent attorney, (2) was not coerced into making a rash decision by the circumstances under which the agreement was signed, (3) had substantial business experience and business acumen, and (4) was aware of the financial resources of the other party and understood the rights that were being forfeited. *See, e.g., Matson,* 730 P.2d at 671. Because, in the instant case, the premarital agreement signed by Vicky left her with no resources or means of support in the event of a divorce, and because Vicky probably would have received more under the community property laws of Nevada were it not for the premarital agreement, there is a presumption that the agreement was fraudulent. Therefore, the agreement should not be enforced unless this presumption is overcome by the aforementioned considerations.

The presumption of fraud may be overcome by a finding that the disadvantaged party had the opportunity to consult with an attorney of his or her own choosing. Muscelli v. Muscelli, 96 Nev. 41, 43, 604 P.2d 1237, 1237-38 (1980) (post-marital agreement). *See also* Hill v. Hill, 356 N.W.2d 49, 53 (Minn.App. 1984); Bauer v. Bauer, 464 P.2d 710, 712 (Or.App. 1970); *Matson,* 730 P.2d at 671. In Knoll v. Knoll, 671 P.2d 718, 719 (Or.App. 1983), the court upheld the validity of a premarital

agreement where the disadvantaged wife did not obtain the advice of counsel. However, the court noted that the agreement was drafted by the husband's attorney seven or eight months before it was signed by the parties, and that the husband's attorney had repeatedly advised the prospective wife to seek counsel. *Id.* The wife did not seek the advice of counsel and testified that she had not even read the agreement. *Id.* Given these circumstances, the court concluded that the wife had failed to meet her obligation to protect her own interests. *Id.* at 720.

In contrast, in the instant case, the premarital agreement was drafted by Avila, Paul's attorney. Avila had been Vicky's attorney during her previous divorce, so she had reason to trust him. On the day Vicky was first presented with the agreement, Avila had arranged an appointment for Vicky to meet with Cox. Vicky was never advised that she should select her own attorney. Cox spent less than an hour discussing the agreement with Vicky, and they were unable to discuss it in its entirety because Paul interrupted them. After the parties' marriage, when Cox was asked to sign the attorney's certificate, he refused because he felt that he had not been able to independently advise Vicky. Therefore, we conclude that Vicky did not receive the benefit of counsel from her brief meeting with Cox.

In addition, we reject Paul's contention that Vicky had ample opportunity to seek the advice of counsel between the time Paul called off the wedding and the time the parties reconciled. Because Vicky had no reason to know that the agreement would again become necessary, she had no reason to consult an attorney. Furthermore, she had not been given a copy of the agreement that she could show to an attorney. Finally, when Vicky was asked to sign the agreement a second time, shortly before the second wedding date, Paul's attorney was not present and Vicky was not given time to consult with her own attorney. Thus, we conclude that Vicky was not accorded an opportunity to obtain the assistance of counsel sufficient to overcome the presumption of fraud.

The circumstances surrounding the signing of a premarital agreement must also be considered in determining its enforceability. *See, e.g.,* Matter of Marriage of Matson, 730 P.2d 668, 672 (Wash. 1986). In particular, circumstances which impose time pressure on the disadvantaged party have been held to invalidate the agreement. For example, in *Matson,* the agreement was invalidated because the first meeting to review a sample agreement occurred only three days prior to the day the agreement was signed, which was the night before the wedding. *Id.* In addition, the wife was not given a copy of the document to review during those three days. Similarly, in Bauer v. Bauer, 464 P.2d 710, 712

(Or.App. 1970), the court refused to uphold an agreement where the disadvantaged wife learned about the agreement the day the couple left to get married.

In the instant case, Vicky was taken to Paul's attorney's office to sign the premarital agreement the day before their initial wedding date. While consulting with the attorney chosen for her by Paul, Paul interrupted Vicky, demanding to know the reason for the delay. Because she would not sign immediately, Paul called off the wedding. When Paul contacted Vicky several weeks later to attempt a reconciliation, he stressed that they had to get married immediately so that they would not miss the honeymoon cruise they had planned. Vicky was not presented with a copy of the agreement again until the morning of her wedding, when she was again under pressure to sign it because her wedding would be called off if she did not. We conclude that the circumstances surrounding the signing of the agreement prevented Vicky from adequately protecting her rights. Therefore, these circumstances support Vicky's contention that the agreement should not have been enforced.

Premarital agreements which seem unfair on their face will sometimes be upheld when the disadvantaged party to the agreement has substantial business experience. Merrill v. Estate of Merrill, 552 P.2d 249, 250 (Or. 1976). In *Merrill,* the wife's substantial business experience was found to be sufficient to rebut the presumption of unfairness where the wife had a realtor's license in California and Oregon, had been in business with her former husband, and had assets totaling $400,000 prior to the marriage. *Id.* Similarly, in McFerron v. Trask, 472 P.2d 847, 848-50 (Or.App. 1970), the court upheld a premarital agreement where the disadvantaged wife had formerly operated her own floral business and had supported herself throughout most of the marriage.

However, in this case, we find Paul's argument that Vicky was a sophisticated businesswoman tenuous. Paul argues that Vicky had substantial business experience because she (1) had managed her own finances during her career as a professional country singer, (2) had worked in Europe for five years, and (3) had been engaged in a business venture involving international currency arbitrage. In contrast, Vicky testified that the extent to which she managed her finances when she was a singer was that she cashed checks and deposited them into her bank account. Furthermore, her work in Europe consisted merely of demonstrating wireless

telephone models for her brother's company. Finally, Vicky's involvement in "international currency arbitrage" consisted of her mortgaging her home to give money to four people who claimed to be engaged in this business, in exchange for the promise that she would receive five million dollars for her investment. Although she attended several meetings with this foursome while in Europe, she did not know whether a partnership or corporation had been formed, she was unable to locate her partners upon returning to the United States, and she did not know what had happened to the business when she left, except that someone had told her that it went bankrupt. Vicky took no action to protect her investment. We cannot but conclude that Vicky's business venture was a swindle in which she was the unwary prey, and that Vicky is in fact extremely unsophisticated with respect to business matters. Therefore, we conclude that the presumption that the premarital agreement is unfair is not overcome by the extent of Vicky's business experience.

Finally, premarital agreements will be enforced only where the party seeking to enforce the agreement fully disclosed his or her assets to the other party prior to signing. *See, e.g.,* Matter of Estate of Crawford, 730 P.2d 675, 678 (Wash. 1986) (premarital agreement declared void where the agreement listed the husband's property but not its value).

In this case, the financial statement describing Paul's net worth was not attached to the agreement when Vicky signed it, although the agreement referred to this attachment. Paul testified that Vicky was familiar with his home, and that he had driven her around to see some of his other properties, although he had not told her their value. Although Vicky knew that Paul was wealthy, her testimony suggests that she underestimated the extent of his wealth. We conclude that Paul failed to make the disclosures necessary to permit Vicky to make an informed decision with respect to the premarital agreement, and that therefore, the agreement is invalid.

Because we conclude that the premarital agreement is invalid, we do not need to reach the issues arising from the second phase of the proceedings in this case. Accordingly, we reverse the judgment of the district court and remand this case with the instruction that it be retried before a different district court judge.