Justice Laurie McKinnon delivered the Opinion of the Court.
***288 ¶ 1 Michele Hutchins (Michele) appeals from orders of the Fourth Judicial District Court, Missoula County, dissolving her marriage to Michael Hutchins (Michael). We affirm and restate the issues on appeal as:
1. Is the parties' premarital agreement enforceable?
2. Did the District Court equitably apportion the marital estate?
3. Did the District Court abuse its discretion by valuing some of the parties' assets at the time of separation?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2 Michael graduated from medical school in 1985 and later that year met Michele. Michael and Michele lived in Nevada and dated on-and-off for a few years. Michael worked as a physician for the State of Nevada and Michele worked as a graphic designer. The couple eventually moved in together. In 1990, Michael proposed to Michele and she accepted. During the parties' engagement, Michele left her job to undertake homemaker duties and oversee construction of the couple's new home.
¶ 3 On August 9, 1991, the parties executed a document entitled "Pre-Nuptial Agreement" (Premarital Agreement). Michael and Michele married on August 16, 1991, one week after they executed the Premarital Agreement. The couple lived in Las Vegas, where Michael worked as a physician and Michele as a homemaker. Michele earned her bachelor's degree in fine arts, became a certified Pilates instructor, and took photography classes.
¶ 4 In 2006, the parties moved to Montana. At that time, Michael retired from his position with the State of Nevada and began receiving monthly retirement distributions from his Nevada Public Employees Retirement System (Nevada PERS) account. Michael and Michele purchased land outside of Missoula, Michele oversaw construction of a new home, and Michael obtained new employment as a physician. Throughout their marriage, Michael worked as a physician earning substantial income, which allowed the parties to accumulate significant assets and enjoy an above-average standard of living. Michele worked as a homemaker and briefly as a Pilates instructor.
¶ 5 In April 2014, Michele announced she wanted a separation and ***289 eventually moved out of the marital home. In January 2015, Michele filed a petition for dissolution of marriage. As the dissolution proceeding progressed, Michele sought a declaratory ruling that the Premarital Agreement was unenforceable. The District Court denied Michele's request, ultimately concluding the agreement was enforceable. The case proceeded to a bench trial in January 2017, at which both parties presented evidence and proposed apportionments of the marital estate. The District Court issued its findings, conclusions, and order of dissolution in August 2017. Michele appeals the District Court's orders regarding the Premarital Agreement and the division of marital assets. *508 Additional facts are supplied throughout the opinion as needed.
STANDARD OF REVIEW
¶ 6 The determination of which state's law to apply in a particular situation is a question of law that we review de novo. Masters Group Int'l, Inc. v. Comerica Bank , 2015 MT 192, ¶ 33, 380 Mont. 1, 352 P.3d 1101. Nevada courts review the validity of a premarital agreement de novo. Gonzales-Alpizar v. Griffith , 130 Nev. 10, 317 P.3d 820, 827 (2014).
¶ 7 Section 40-4-202, MCA, governs the distribution of a marital estate. A district court has broad discretion to apportion the marital estate in a manner equitable to each party under the circumstances. In re Marriage of Spawn , 2011 MT 284, ¶ 9, 362 Mont. 457, 269 P.3d 887. In making its findings and conclusions, the district court must consider the factors listed in § 40-4-202, MCA. In re Marriage of Hollamon , 2018 MT 37, ¶ 8, 390 Mont. 320, 413 P.3d 460. We review a district court's division of marital property to determine whether the court's findings of fact are clearly erroneous and whether its conclusions of law are correct. Deschamps v. Deschamps , 2009 MT 431, ¶ 11, 354 Mont. 94, 223 P.3d 324. A finding is clearly erroneous if it is not supported by substantial credible evidence, if the court misapprehended the effect of the evidence, or if a review of the record leaves us with the definite and firm conviction that the court committed a mistake. In re Marriage of Edwards , 2015 MT 9, ¶ 9, 378 Mont. 45, 340 P.3d 1237. A district court's apportionment of the marital estate will stand unless there was a clear abuse of discretion as manifested by a substantially inequitable division of the marital assets resulting in substantial injustice. Richards v. Trusler , 2015 MT 314, ¶ 11, 381 Mont. 357, 360 P.3d 1126. We examine each case individually, with an eye to its unique circumstances. Spawn , ¶ 9.
***290 ¶ 8 A district court's valuation of a marital estate is a discretionary ruling that we review for an abuse of discretion. In re Marriage of Thorner , 2008 MT 270, ¶ 21, 345 Mont. 194, 190 P.3d 1063. The test for an abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. Thorner , ¶ 21.
DISCUSSION
¶ 9 1. Is the parties' premarital agreement enforceable?
¶ 10 Michele asked the District Court to declare the Premarital Agreement unenforceable, while Michael sought to enforce the agreement. The District Court considered the parties' briefs, held a hearing at which both Michele and Michael testified, and ultimately enforced the Premarital Agreement. The Premarital Agreement contained a choice-of-law provision, so we must first determine which state's law governs.
A. Choice of Law
¶ 11 The Premarital Agreement's choice-of-law provision provided, "This agreement shall be interpreted and enforced in accordance with the laws of the State of Nevada in effect at the time of its execution." The District Court quoted the choice-of-law provision and concluded the Premarital Agreement "should be construed according to Nevada law, as provided in the document." However, the court further concluded Montana law also applied to the agreement's enforceability because the dissolution and division of assets was occurring in Montana. The court proceeded to apply Montana's statutes and case law to its analysis of the Premarital Agreement's enforceability.
¶ 12 Pursuant to the Uniform Premarital Agreement Act (UPAA), which both Montana and Nevada have adopted, parties to a premarital agreement may contract with respect to the "choice of law governing the construction of the agreement." Section 40-2-605(1)(g), MCA ; Nev. Rev. Stat. § 123A.050(1)(g). As a general rule, Montana courts enforce choice-of-law provisions and apply the law of the state the parties chose. Tenas v. Progressive Preferred Ins. Co. , 2008 MT 393, ¶ 32, 347 Mont. 133, 197 P.3d 990 (citing Restatement (Second) of Conflict of Laws § 187(2) ). A court will not apply a choice-of-law provision if either (1) "the chosen *509 state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially ***291 greater interest than the chosen state in the determination of the particular issue and which ... would be the state of the applicable law in the absence of an effective choice of law by the parties." Tenas , ¶ 32 (quoting Restatement (Second) of Conflict of Laws § 187(2) ).
¶ 13 We determine the District Court erred by analyzing the Premarital Agreement under Montana law. Neither exception to the general rule that Montana courts enforce choice-of-law provisions applies in this case. We accordingly apply the Premarital Agreement's choice-of-law provision and conclude Nevada law controls our interpretation of the Premarital Agreement's enforceability. We note, however, that the choice-of-law provision relates only to the parties' Premarital Agreement. It does not relate to the dissolution proceeding as a whole; Montana law governs the remainder of the proceeding, including the equitable division of the marital estate. See Proctor v. Mavis , 203 Or.App. 499, 125 P.3d 801, 803 (2005) (concluding, under the UPAA, a premarital agreement's choice-of-law provision applied only to the agreement's enforceability, not to the division of assets). While the District Court erred in applying Montana law, the factual findings upon which it based its decision permit us to apply Nevada law to determine whether the Premarital Agreement is enforceable.
B. Enforceability of the Premarital Agreement under Nevada Law
¶ 14 Michael and Michele executed the Premarital Agreement on August 9, 1991, and married one week later on August 16, 1991. The agreement stated that the parties "agreed to retain a single attorney to draft this agreement and to advise them of their respective rights and obligations under law and the ways and manner in which this agreement might alter such rights and obligations." The agreement further provided that each party "understands that said counsel does not represent either of them individually." The agreement listed each party's separate property. Michael's list included sixteen investment accounts, an undeveloped parcel of real property, an antique vehicle, and personal items. Michele's list only included personal items; she did not own any investments or real estate. The agreement also provided that each party waived spousal maintenance claims in the event of divorce.
¶ 15 Michele and Michael recalled different versions of the events surrounding the compilation and execution of the Premarital Agreement, but the District Court resolved the factual dispute in favor of Michele's memory. Michele recalled that, on August 9, 1991, one week before their wedding date, Michael took her to a law office in Las Vegas where the couple met with attorneys she had never encountered before. The attorneys presented the fully prepared Premarital ***292 Agreement and read the agreement to the parties. Michele stated she was surprised, embarrassed, and sad about the agreement, but she signed it anyway because the wedding was set to occur the following week. The District Court found "Michele provided credible testimony that she and Michael went to an attorney's office [one week][1] before the date which had been scheduled for their wedding; that she had not had an opportunity to review the agreement prior to going to this attorney's office; that she had no part in drawing up the agreement; and that she did not consult with her own attorney prior to the date that she signed the agreement." *510 Based on those facts, the District Court, applying Montana law, enforced the Premarital Agreement. While we affirm its conclusion, we instead apply Nevada law to the court's factual findings.
¶ 16 Nevada's UPAA governs any premarital agreement executed after October 1, 1989. 1989 Nev. Stat., ch. 472, § 22, at 1009; Kantor v. Kantor , 116 Nev. 886, 8 P.3d 825, 829 (2000). Michael and Michele executed the Premarital Agreement in 1991, and, accordingly, the UPAA governs the Premarital Agreement. See Fick v. Fick , 109 Nev. 458, 851 P.2d 445, 449 (1993).[2] Under the UPAA, a premarital agreement is enforceable ***293 without consideration if it is in writing and signed by both parties. Fick , 851 P.2d at 449 (citing Nev. Rev. Stat. § 123A.040 ). A premarital agreement may, among other things, eliminate spousal maintenance in the event of a divorce. Nev. Rev. Stat. § 123A.050(1)(d). The burden of proving the unenforceability of a premarital agreement is on the party challenging the agreement. Kantor , 8 P.3d at 830 (citing Nev. Rev. Stat. § 123A.080 ). "A premarital agreement is not enforceable if the party against whom enforcement is sought proves that":
(a) That party did not execute the agreement voluntarily;
(b) The agreement was unconscionable when it was executed; or
(c) Before execution of the agreement, that party:
(1) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;
(2) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and
(3) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
Nev. Rev. Stat. § 123A.080(1)(a)-(c).
¶ 17 Michele is the party challenging the Premarital Agreement and, accordingly, has the burden to prove its unenforceability. See Kantor , 8 P.3d at 830.
1. Voluntariness
¶ 18 Under Nev. Rev. Stat. § 123A.080(1)(a), a premarital agreement is unenforceable if the party against whom enforcement is sought proves she did not execute the agreement voluntarily. The Nevada Supreme Court has not yet addressed how to determine whether a party's execution was involuntary under the UPAA, but based on its pre-UPAA common law, we presume it would consider the following factors: whether the party claiming she did not voluntarily execute the agreement had ample opportunity to consult an attorney, whether the party was coerced into signing the agreement, *511 whether the ***294 party possessed substantial business acumen, and whether the party was under time pressure to execute the agreement-e.g., if the premarital agreement was presented to her the day before or the morning of her wedding. See Fick , 851 P.2d at 449 ; Sogg , 832 P.2d at 784-85.
¶ 19 We construe Michele's argument under pre-UPAA Nevada common law as an argument that she did not voluntarily execute the agreement. We conclude, however, that Michele voluntarily executed the Premarital Agreement. Michele had the opportunity to consult her own attorney: if she declined to sign the agreement on August 9, 1991, she had a week to obtain independent counsel before the parties wed on August 16, 1991. There is no evidence that Michele was coerced into signing the agreement and, given that she was twenty-seven-years old and had previously held various jobs, Michele's age and background indicate she possessed substantial business acumen to understand the scope of the Premarital Agreement. Further, Michael presented the Premarital Agreement to Michele a full week before their scheduled wedding, meaning Michele was not under significant time pressure to render the agreement's execution involuntary.
¶ 20 Michele also argues that it was inappropriate for a single attorney to draft the Premarital Agreement. However, Nevada law does not require individual counsel for each party to a premarital agreement. The Premarital Agreement clearly provided that the attorney who drafted the agreement did not represent either party. Given the circumstances, we cannot find the agreement was involuntarily executed based on the fact that a single attorney drafted the agreement.
2. Unconscionability at Execution
¶ 21 Differing slightly from the UPAA, Nev. Rev. Stat. § 123A.080(1)(b) provides unconscionability at execution as a separate basis upon which to hold a premarital agreement unenforceable.[3] A court determines the issue of unconscionability of a premarital agreement as a matter of law. Nev. Rev. Stat. § 123A.808(3). "A contract is unconscionable only when the clauses of that contract and the circumstances existing at the time of the execution of the contract ***295 are so one-sided as to oppress or unfairly surprise an innocent party." Bill Stremmel Motors, Inc. v. IDS Leasing Corp. , 89 Nev. 414, 514 P.2d 654, 657 (1973).
¶ 22 The clauses of the Premarital Agreement are not so one-sided as to oppress or unfairly surprise Michele. The Premarital Agreement was standard: it provided that each party would retain his or her separate property and eliminated the possibility of spousal support in the event of divorce. Those terms are not one-sided; the fact that Michael had more separate property than Michele does not render the agreement's clauses unconscionable towards her. Further, the circumstances existing at the time of the Premarital Agreement's execution were not so one-sided as to have oppressed or unfairly surprised Michele. As discussed above, the parties executed the agreement one week before their wedding and Michele, possessing sufficient business acumen to understand the legal significance of the document, freely executed the agreement. The Premarital Agreement was not unconscionable when executed.
3. Fair and reasonable disclosure of the parties' property and financial obligations
¶ 23 Nev. Rev. Stat. § 123A.080(1)(c)(1) requires a party to provide a "fair and reasonable disclosure" of his property and financial obligations to his future spouse before executing a premarital agreement. While some states require a "full and fair" disclosure of assets,[4] Nevada requires *512 a "fair and reasonable" disclosure of assets. Nev. Rev. Stat. § 123A.080(1)(c)(1). Whether a disclosure of property and financial obligations is fair and reasonable depends on the circumstances of the case. Generally speaking, each party must have a clear enough picture of the other's property to understand the magnitude of the other's assets and obligations. See Fick , 851 P.2d at 449. That does not necessarily mean each asset must be valued[5] or that ***296 failure to list one asset renders the rest of the disclosure deficient. A disclosure is sufficient if it is "fair and reasonable," as a whole, in light of the particular circumstances.
¶ 24 In Fick , the parties signed a premarital agreement drafted by the husband. Fick , 851 P.2d at 447. The agreement itself did not disclose the parties' assets and financial obligations, but it stated that each party had attached a schedule containing his or her premarital assets and obligations. Fick , 851 P.2d at 447. However, the husband's schedule was not attached when the parties signed the agreement-he attached his schedule a year later, after the parties were already married. Fick , 851 P.2d at 447. The Nevada Supreme Court determined the husband's late disclosure did not satisfy Nev. Rev. Stat. § 123A.080(1)(c) 's disclosure requirement because the statute requires the disclosure to occur before the parties execute the premarital agreement. Fick , 851 P.2d at 449. The court reasoned that the wife "could not have known the full magnitude of [the husband's] assets and obligations before marriage." Fick , 851 P.2d at 449. Because the husband failed to disclose his assets and obligations before the wife signed the agreement, the Nevada Supreme Court determined the premarital agreement's provisions regarding spousal support were unenforceable. Fick , 851 P.2d at 449-50.
¶ 25 Here, the Premarital Agreement listed Michael's "separate property," which included a specific list of sixteen investment accounts, a parcel of undeveloped real property valued at $60,000, and an antique vehicle. Regarding the sixteen investment accounts, the disclosure included the account and fund numbers and how many shares of stock Michael owned, but it did not include accounts' values. The disclosure also did not list Michael's Nevada PERS account, which had not yet vested when the parties executed the Premarital Agreement. Michele contends Michael's disclosure of assets was inadequate because he did not include the value of his investment accounts and did not include his Nevada PERS account in his list of assets. Michael responds that he did not include the Nevada PERS account on his list of assets because he did not consider it an asset at that time, as it did not vest until after the parties married. He also acknowledges that he is not seeking to exclude the Nevada PERS account from the marital estate-he understands that the account vested during the marriage and that Michele is entitled to an equitable share of the marital portion of the account. Further, all of the sixteen investment accounts listed in the agreement were merged with other accounts or otherwise disposed of during the marriage.
***297 ¶ 26 This case is distinguishable from Fick , where the husband failed to disclose any assets prior to the agreement's execution. Here, Michael provided an extensive list of assets, listing sixteen investment accounts, a parcel of undeveloped real property, and his antique vehicle. Michael's failure to include his Nevada PERS account-which had not yet vested-does not render Michael's property disclosure, as a whole, insufficient in light of Michael's remaining disclosures. Similarly, the fact that Michael did not value his investment accounts does not mean Michele *513 could not have ascertained the full magnitude of Michael's assets from the list. Overall, Michael's disclosure provided Michele with a fair and reasonable disclosure of his property from which she should have been able to understand the magnitude of Michael's assets. See Fick , 851 P.2d at 449. We decline to declare the parties Premarital Agreement unenforceable based on Michael's failure to list the Nevada PERS account or provide investment account values. Michael appropriately provided Michele with a "fair and reasonable disclosure of property" as required by Nev. Rev. Stat. § 123A.080(1)(c)(1).
¶ 27 Michele did not prove that she did not execute the Premarital Agreement voluntarily, that the Premarital Agreement was unconscionable when executed, or that she was not provided a fair and reasonable disclosure of Michael's property and financial obligations before she executed the Premarital Agreement. See Nev. Rev. Stat. § 123A.080(1). Under Nevada law, the parties' Premarital Agreement is enforceable and we therefore conclude the District Court did not err in enforcing the agreement.
¶ 28 2. Did the District Court equitably apportion the marital estate?
¶ 29 Michele raises four issues on appeal relating to the District Court's apportionment of the marital estate. She argues the District Court failed to equitably apply § 40-4-202, MCA, in its division of assets; erred in its distribution of the Nevada PERS account; abused its discretion in its valuation of Michael's office suite; and abused its discretion by distributing the parties' dog, Skeeter, to Michael. We address each issue in turn.
A. The District Court's application of § 40-4-202, MCA
¶ 30 In a dissolution proceeding, the court must equitably divide the parties' property. Section 40-4-202(1), MCA. In making the apportionment, "the court shall consider the duration of the marriage and prior marriage of either party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to maintenance, ***298 and the opportunity of each for future acquisition of capital assets and income." Section 40-4-202(1), MCA. The court shall also consider "the contribution of a spouse as a homemaker." Section 40-4-202(1), MCA. The court must refer to and consider the § 40-4-202, MCA, factors in its findings and conclusions. In re Marriage of Funk , 2012 MT 14, ¶ 7, 363 Mont. 352, 270 P.3d 39 (citing In re Marriage of Collett , 190 Mont. 500, 504, 621 P.2d 1093, 1095 (1981) ).
¶ 31 Section 40-4-202, MCA, "vests the district court with broad discretion to apportion the marital estate in a manner equitable to each party under the circumstances." Funk , ¶ 6. The statute requires an equitable, not necessarily equal, division of the marital estate. Spawn , ¶ 9. The court is "not required to award the parties property of precisely equal value." In re Marriage of David , 2009 MT 422, ¶ 21, 354 Mont. 44, 221 P.3d 1209 (citing In re Marriage of Payer , 2005 MT 89, ¶ 14, 326 Mont. 459, 110 P.3d 460 ).
¶ 32 Michele argues the District Court failed to correctly apply § 40-4-202, MCA, to its division of the marital estate, alleging two specific errors. First, Michele argues the District Court failed to account for the negative impact the foreclosure of the couple's marital home had on Michele's credit-score. After the parties separated, the lending bank approved a short sale and foreclosure on their marital home, negatively impacting Michele's credit score, which may cause her more difficulty in purchasing a home in the future. Michele faults the District Court for failing to make "a single finding ... on the difficulty imposed upon Michele by the destruction of her credit."
¶ 33 Michele's assertion is incorrect. The District Court's findings of fact directly considered Michele's credit-score decline: "While this decline may hamper her ability to borrow funds to finance a new home ... Michele should have sufficient resources to obtain suitable housing." The District Court clearly considered the impact of Michele's credit-score decline and we find the court did not abuse its discretion by failing to further factor *514 Michele's credit-score decline into its distribution of assets.
¶ 34 Second, Michele argues the District Court's division of property pursuant to § 40-4-202, MCA, failed to adequately account for Michele's financial needs. Michele contends the District Court did not sufficiently account for Michele's homemaker contributions when it applied § 40-4-202, MCA. However, the District Court concluded, "Michele gave up her own employment and career advancement over the 25-year marriage and pre-marital relationship to serve as a homemaker while Michael was working, at times long hours." The court then found that "[w]ithout these monetary and non-monetary contributions by Michele ***299 as a homemaker, Michael would not have been able to maintain his job." The District Court clearly took Michele's homemaker contributions into account when it divided the marital estate.
¶ 35 In further regard to her financial needs, Michele contends the District Court failed to consider the parties' occupations, amount and sources of income, vocational skills, employability, and ability to acquire future assets when it divided the marital estate. See § 40-4-202(1), MCA. Michele's argument is unpersuasive-the District Court's comprehensive findings of fact and conclusions of law distributing the marital estate considered the parties' respective career prospects and earning capacities.
¶ 36 The District Court found that, before the parties married, Michele worked as a graphic designer. During the marriage, Michele obtained her Bachelor of Arts Degree in Fine Art, became a certified Pilates instructor, and obtained photography training. Michele held brief employment during the marriage, earning approximately $3,000 by teaching private Pilates classes. The court found Michele had few, if any, transferable skills or education and that her best chance of employment was in an entry-level or clerical position. The District Court found Michele qualified to work in retail, call centers, and with horses. The court acknowledged that, while Michele was not employed at the time of trial, it was "reasonable to believe that Michele could obtain employment" paying between $10 per hour and $14 per hour. On the other hand, the District Court found that Michael, an internal medicine physician, earned $294,727.93 in tax year 2015. On October 7, 2016, Michael's year-to-date wages for tax year 2016 were $195,909.84.
¶ 37 The District Court applied those factual findings to § 40-4-202(1), MCA's factors in its conclusions of law. The court recognized Michele did not have the "opportunity to secure her own retirement or leave the marriage able ... to immediately support herself. ... In contrast, Michael's future, including his retirement, are secured by current and future employment benefits, comprised of his retirement and various investment accounts, and ongoing employer paid benefits." Acknowledging that Michele had fewer resources upon which to support herself post-dissolution, the District Court apportioned Michele 75% of the Nevada PERS account to ensure Michele had consistent income of approximately $60,000 per year. The District Court concluded the distribution was "necessary to off-set [Michele's] lower wage-earning capacity." The District Court further noted Michele could seek employment if she chose to, which would provide her with additional annual income of $20,800 to $29,120. The court recognized ***300 the amount was "less than the estimated annual gross income of $121,344" Michele sought, but concluded the division was "reasonable and equitable" and would provide Michele "with ongoing income to meet her reasonable expenses."
¶ 38 The District Court also apportioned life insurance, additional retirement accounts, and significant amounts of personal property to Michele. The court determined its division provided Michele with sufficient income to be self-supporting and also provided her with additional assets for retirement purposes. We find the District Court conscientiously considered § 40-4-202(1), MCA's factors and did not abuse its broad discretion in equitably apportioning Michael and Michele's marital estate.
B. The District Court's distribution of the Nevada PERS account
¶ 39 The Nevada PERS account was the largest single asset in the marital estate. Michael started contributing to the retirement *515 plan before the parties married and continued his contributions until he left his employment when the parties moved to Montana in 2006. Michael elected retirement and therefore the account distribution, in the form of monthly benefit payments, was already in progress when the parties separated. Both parties' experts calculated the marital portion of the Nevada PERS equaled 84.983%. The District Court distributed 75% of the account's marital portion to Michele and 25% of the marital portion to Michael. Michael received the premarital portion. Michael did not elect survivor benefits and, accordingly, Michele's distributive share of the Nevada PERS is dependent on Michael's life.
¶ 40 Michele alleges three errors regarding the Court's distribution of the Nevada PERS account. First, Michele argues the District Court incorrectly concluded she was not entitled to a share of the premarital portion of the Nevada PERS account. "In dividing property acquired prior to the marriage ... the court shall consider those contributions of the other spouse to the marriage, including: (a) the nonmonetary contribution of a homemaker; (b) the extent to which the contributions have facilitated the maintenance of the property; and (c) whether or not the property division serves as an alternative to maintenance arrangements." Section 40-4-202(1), MCA. In reviewing a district court's division of premarital property, we "ask whether the district court adequately considered all of the relevant facts of the particular case; whether it considered the statutory factors; and then whether it equitably distributed all property and assets accordingly." Funk , ¶ 15. A party claiming ownership of premarital property is entitled to argue it would be equitable to award him the entire property. Funk , ¶ 19. Accordingly, when distributing premarital ***301 property, the court must consider the other spouse's contributions to the marriage, including the factors set forth in § 40-4-202(1)(a)-(c), MCA. Funk , ¶ 19. The court's decision regarding premarital property must affirmatively reflect that the court considered and analyzed each factor and the decision must be based on substantial evidence. Funk , ¶ 19.
¶ 41 The District Court considered all of the § 40-4-202(1)(a)-(c), MCA, factors when it determined Michele was not entitled to the premarital portion of the Nevada PERS account. The court discussed Michele's homemaker contributions and decided those contributions did not contribute to maintenance of the Nevada PERS account. The court further noted that, because the Premarital Agreement specifically prohibited maintenance, the property division could not serve as an alternative to maintenance. The District Court's decision affirmatively reflects that it considered and analyzed each statutory factor and the court's decision is based on substantial evidence. The District Court did not abuse its discretion in determining that Michele was not entitled to the premarital portion of the Nevada PERS account.
¶ 42 Second, Michele argues the District Court misconstrued and misapplied Rolfe v. Rolfe , 234 Mont. 294, 766 P.2d 223 (1988). Montana courts use one of two methods to value and divide retirement benefits: the present-value method, which requires a lump-sum distribution; and the time-rule method, which defers distribution and divides the marital portion of the pension benefits when they are paid. In re C.W. , 2012 MT 212, ¶ 20, 366 Mont. 278, 291 P.3d 1092 (citing Spawn , ¶ 12 ). Courts use a specific formula from Rolfe to calculate the benefit distribution under the time-rule method. Rolfe , 234 Mont. at 298, 766 P.2d at 226.
¶ 43 While acknowledging courts prefer the present-value method, the District Court found the time rule-rule method more appropriate in this case because the benefit payments were already in progress. It also noted that, because Michele had a lower wage-earning capacity than Michael going forward, distributing a bulk of the monthly payments from the Nevada PERS account would provide Michele monthly income to help meet her monthly expenses. On appeal, Michele contends the court abused its discretion by using the time-rule method. She argues the court should have used the present-value method and required Michael to either purchase her share or substitute other assets for her share of the Nevada PERS account.
*516 ¶ 44 We conclude the District Court did not abuse its discretion by using the time-rule method to divide the Nevada PERS account. The ***302 District Court concluded it was most equitable to apply the Rolfe formula and award Michele 75% of the account's marital portion. This distribution makes sense: Michele needed income and the Nevada PERS account provided monthly distributions, which were already in progress. The court's decision to use the time-rule method was appropriate and well within the District Court's discretion. See In re C.W. , ¶ 23.
¶ 45 Third, Michele contends the District Court did not account for Michele's cost of insuring Michael's life when it distributed the marital estate. The District Court recognized Michele would not be able to collect her share of the Nevada PERS account if Michael passed away, but decided Michele could secure the value of the Nevada PERS account by insuring Michael's life. At the time the District Court issued its decision, Michele was the beneficiary of Michael's term life insurance policy, which had a death benefit of $1 million dollars. While the parties were separated for three years, Michael paid the policy's insurance premiums of $4,700 per year for a total of $14,100. The District Court ordered Michael to retain the policy at his expense, with Michele as his beneficiary, for at least one more year. Thereafter, Michele needed to obtain an insurance policy on Michael's life to secure the value of her portion of the Nevada PERS account, approximately $592,133.26.
¶ 46 On appeal, Michele argues the District Court abused its discretion by failing to account for Michele's future costs of insuring Michael's life when it distributed the marital estate. In its distribution of the marital estate, the District Court credited Michael $18,800 for his four years of life insurance payments. Michele alleges the District Court erred by not similarly crediting her for her future costs to insure Michael's life.
¶ 47 Michele's allegation overlooks the District Court's conclusions of law regarding the Nevada PERS account. While Michele is correct in her assertion that the District Court's line-item distribution did not specifically account for Michele's future costs to insure Michael's life, the District Court expressly concluded it was "reasonable to provide Michele with a greater portion of the marital estate so that she can obtain a life insurance policy on Michael's life to secure the value of [the Nevada PERS account] in the event of his death." The court then provided Michele with a greater portion of the marital estate, distributing 51.57% to Michele and 48.43% to Michael. The District Court knew Michele would incur ongoing expenses to insure Michael's life and specifically apportioned Michele a greater portion of the marital estate to account for those costs. The District Court did not abuse its discretion by apportioning Michele a greater portion of the ***303 marital estate instead of specifically accounting for the cost of Michael's life insurance in its line-item distribution.
C. The District Court's valuation of Michael's office suite
¶ 48 Michael and his business partner each owned 50% of Internal Medicine of Missoula, LLC (IMM). IMM existed for the sole purpose of owning a medical office suite. IMM leased the office suite to Michael's employer, Providence Health and Services. At trial, Michael presented expert testimony regarding the office suite's value. The expert calculated the office suite's final estimated value as $760,000, with Michael's 50% share equaling $380,000. The expert obtained the $760,000 value after looking at the property floor plan, touring the property, and considering the prices of comparable properties. The expert further testified the office suite's cash-flow value, which took into account the actual value of IMM's lease with Providence Health and Services, was $1,115,214. He testified the cash-flow value was unusually high and an unreliable valuation considering some of the lease terms. The expert testified that, in his opinion, the office suite was not worth the full extent of its cash-flow value and was most appropriately valued at $760,000.
¶ 49 Michele did not provide her own expert valuation, but asked the District Court to value the office suite using the cash-flow value of $1,115,214. Michele argued federal law, specifically the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, *517 42 U.S.C. § 1395nn, required the District Court to use the $1,115,214 valuation. The District Court recognized Michele's argument, but found Michele failed to introduce any evidence or testimony regarding how the federal laws pertain to the office suite's valuation. Noting Michele's failure to provide any support for her valuation request, the court adopted the $760,000 valuation in its findings of fact. On appeal, Michele asserts the District Court erred by valuing the office suite at $760,000. She argues that, in order for the lease between IMM and Providence Health and Services to comply with federal law, the office suite's value must be $1,115,214.
¶ 50 A district court may adopt any reasonable valuation of property supported by the record. In re Marriage of Haberkern , 2004 MT 29, ¶ 13, 319 Mont. 393, 85 P.3d 743. A district court may assign any value to an item of property that is within the range of values offered into evidence. In re Marriage of Hochhalter , 2001 MT 268, ¶ 33, 307 Mont. 261, 37 P.3d 665 ; Edwards , ¶ 25 (reasoning that it is the province of the district court to weigh the evidence before it and emphasizing that we will not disturb a district court's valuation if there is evidence in the record to support its decision).
***304 ¶ 51 In this case, the District Court heard credible expert testimony regarding the office suite's value. The expert testified that, depending on the valuation method, the office suite's value ranged between $760,000 and $1,115,214, but that, in his opinion, $760,000 was the best estimate. The District Court valued the office suite at $760,000, which was within the range of values offered into evidence. The District Court's valuation was based on substantial credible evidence and we accordingly conclude the District Court did not abuse its discretion in its valuation.
¶ 52 As to Michele's argument that the District Court should have considered the federal laws, we note that it was the parties' responsibility to provide the District Court with competent evidence regarding property values. See Funk , ¶ 7. Michele did not present the District Court with sufficient evidence regarding how the laws applied to the lease between IMM and Providence Health and Services and how the laws required the District Court to adopt the cash-flow value of $1,115,214. Absent a sufficient record to review regarding the issue, we affirm the District Court's valuation of $760,000.
D. The District Court's distribution of the parties' dog, Skeeter, to Michael
¶ 53 Around the time they separated in 2014, Michael and Michele compiled a list in which they divided their personal property, including their horses, mules, and dogs. The couple had four dogs, including Skeeter and Sunny, brother-sister hunting dogs. The list provided that Michael would take Skeeter and Michele would take Sunny and the other two dogs. At trial, Michele indicated she wished to keep Skeeter, advocating it was better to keep Skeeter and Sunny together because they were bonded to one another and because Michael's work schedule would not allow him to properly care for Skeeter. Michael testified he enjoyed running and hunting with Skeeter and wanted him pursuant to the parties' original personal-property distribution. The District Court acknowledged Michele's concern about separating the dogs, but awarded Skeeter to Michael in what it viewed as the most equitable distribution.
¶ 54 As previously stated, a district court is vested with broad discretion to apportion the marital estate in a manner equitable to each party under the circumstances. In re Marriage of Tummarello , 2012 MT 18, ¶ 23, 363 Mont. 387, 270 P.3d 28. The District Court understood that Michele was concerned about separating Skeeter and Sunny, but determined it was equitable to award Skeeter to Michael and Sunny to Michele. Nothing in the record convinces us that the District Court abused its discretion in its apportionment and we affirm ***305 the District Court's distribution of Skeeter to Michael.
¶ 55 3. Did the District Court abuse its discretion by valuing some of the parties' assets at the time of separation instead of at the time of dissolution?
¶ 56 In mid-2014, Michele moved out of the marital home and she and Michael maintained separate residences thereafter.
*518 In July 2014, the parties separated their finances, including their bank accounts, credit cards, and personal property; they did not comingle their finances after that. The parties also removed each other as the beneficiaries of certain life insurance policies. Michael was fully responsible for post-separation mortgage payments on the marital home; the court determined those payments were his own expense and would not impact the marital estate. Based on those facts, the District Court determined that Michael and Michele financially separated in July 2014. Throughout their separation, Michael and Michele shared the monthly distributions from the Nevada PERS account in varying proportions, at first voluntarily and later by court order. Michele relied on the Nevada PERS account distributions as her sole source of income.
¶ 57 When the District Court distributed the marital estate, it valued Michael and Michele's assets. The District Court valued some assets as of mid-2014, when it found the parties financially separated. The District Court valued other assets as of mid- to late-2016, closer to the time of dissolution. On appeal, Michele contends the District Court abused its discretion by valuing some of the marital estate at the time of separation. She notes that many of the assets-specifically, investment accounts awarded to Michael-significantly increased in value between when the parties separated and when the court dissolved their marriage. Michael argues it was within the District Court's discretion to value some of the assets at the time of separation.
¶ 58 As a general rule, a court should ascertain a marital estate's value at or near the time of dissolution. In re Marriage of Tipton , 2010 MT 144, ¶ 23, 357 Mont. 1, 239 P.3d 116 (citing In re Marriage of Swanson , 220 Mont. 490, 495, 716 P.2d 219, 222 (1986) ). However, unique circumstances permit deviation from the general rule and allow a district court to value a marital estate at the time of separation. Tipton , ¶ 23 (citing Hochhalter , ¶ 17 ). Unique circumstances may exist-and the relevant valuation time may be separation rather than dissolution-where the parties end their marital relationship for all practical purposes and live separately, financially and otherwise. Thorner , ¶ 36 ; Hochhalter , ¶ 18 (explaining that valuation at separation may be appropriate where parties live apart and maintain ***306 separate financial and retirement accounts, make separate financial decisions, and do not contribute monetary or nonmonetary resources to one another). An equitable apportionment of the marital estate is more important than the moment at which the court values the parties' assets. Schwartz v. Harris , 2013 MT 145, ¶ 18, 370 Mont. 294, 308 P.3d 949 (citing In re Marriage of Alexander , 2011 MT 1, ¶ 18, 359 Mont. 89, 246 P.3d 712 ). A district court has broad discretion in when it chooses to value the marital estate and we will not find it abused that discretion unless the court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. Thorner , ¶ 21.
¶ 59 In conformity with the general rule, district courts frequently value the marital estate at or near the time of dissolution. In Schwartz v. Harris , the parties separated in 2002, but continued a "family relationship" until 2009. Schwartz , ¶ 19. The family relationship was evidenced by the husband voluntarily supporting the wife by paying her mortgage and the couple vacationing together and giving their children joint gifts. Schwartz , ¶ 19. The district court used 2009 values and we affirmed, concluding the district court did not abuse its discretion by using the date closer to the time of dissolution. Schwartz , ¶ 20.
¶ 60 However, a district court is well within its discretion to value a marital estate at the time of separation when unique circumstances exist. See, e.g. , Tipton , ¶ 24 (finding the district court did not abuse its discretion by valuing the marital estate at the time of separation-when the parties were no longer living in the same household or commingling their assets). In In re Marriage of Thorner , the value of the wife's retirement account was $62,191 at the time of separation and over $90,000 at the time of dissolution. Thorner , ¶ 38. The husband requested the court use the account's value at the time of dissolution, but the court declined and used the *519 account's value at the time of separation. Thorner , ¶¶ 39-40. The district court reasoned the date of the parties' financial separation-when they began to manage their finances separately and eventually lived separately-marked the end of their marital relationship for purposes of distributing the marital estate. Thorner , ¶ 37. We affirmed on appeal, finding that the district court did not abuse its discretion by valuing the wife's retirement account at the time of separation, noting that the husband was not entitled to any increase in the value of the wife's retirement account after that time. Thorner , ¶ 40.
¶ 61 In this case, the District Court found the parties financially ***307 separated in July 2014, and that finding is supported by substantial evidence in the record. The parties separated their finances and did not comingle assets after that time. Michele characterizes the parties' financial arrangement differently-she contends Michael controlled the entire marital estate and that she only received a small amount of money from the Nevada PERS account each month. Her characterization does not change the fact that, starting in July 2014, the parties had completely separate bank accounts and made separate financial decisions. Michele was in complete control of how she spent her portion of the Nevada PERS account distribution and she could have obtained additional income if she chose to. The parties' financial arrangement as of July 2014, compounded with the fact that they were physically separated living in different homes, signifies an end to the marital relationship for all practical purposes, financially and otherwise. See Thorner , ¶ 36. We find the District Court did not abuse its discretion by finding the parties financially separated in July 2014.
¶ 62 After finding the parties financially separated in July 2014, the District Court reviewed valuations of the marital estate at the time of financial separation and near the time of dissolution. The court examined the effect of distributing the marital estate at each valuation point and concluded that "the value of the marital estate, to the extent possible and appropriate, should be determined at the date of financial separation." The court valued some assets at the time of financial separation and other assets near the time of dissolution.
¶ 63 The District Court valued many assets at the time of financial separation. For example, Michael contributed to four investment accounts post-separation. The District Court apportioned the entirety of those four accounts to Michael and valued the accounts at the date of financial separation. We find the District Court did not abuse its discretion in valuing those accounts at the time of financial separation. Using the time of financial separation was appropriate because Michael contributed to the accounts after the parties financially separated and those accounts were distributed to Michael in full. Michele was not necessarily entitled to the increase in the accounts' values after the parties separated and we cannot say the District Court abused its discretion in its valuation. See Thorner , ¶ 40.
¶ 64 The District Court found it equitable to value other assets at the time of dissolution. For example, in distributing the Nevada PERS account, the District Court found that, while it could value the asset at the time of separation, it found it necessary to value the account at the time of trial "to ensure an equitable division." Further, neither Michele nor Michael contributed to two other investment accounts ***308 post-separation. The District Court divided those accounts equally between Michael and Michele and valued those accounts at the time of dissolution. Another account had not vested when the parties financially separated but vested before trial. The court found it most equitable to value the account near the time of dissolution, instead of at the time of separation, because the vested account value reflected the amount of money available to Michael.
¶ 65 A review of the record clearly demonstrates that the District Court conscientiously considered each asset in the marital estate and determined the most equitable point at which to value it. The court did not act arbitrarily or exceed the bounds of reason by choosing to value some of the marital estate at the time of financial separation rather than at the time of dissolution because unique circumstances existed. We affirm its valuation.
*520 CONCLUSION
¶ 66 The parties' Premarital Agreement is enforceable under Nevada law. The District Court did not abuse its broad discretion in its valuation or distribution of Michael and Michele's marital estate. We accordingly affirm the District Court's orders regarding the Premarital Agreement and the division of marital assets.
We concur:
JAMES JEREMIAH SHEA, J.
JIM RICE, J.
DIRK M. SANDEFUR, J.
¶ 67 I join the Court's Opinion except on Issue Three and on portions of Issue Two.
¶ 68 To begin, although I agree that the District Court generally did not abuse its discretion in distributing the marital estate, several of its conclusions raise concerns. I share the Court's conclusion that the decision to award Michele seventy-five percent of Michael's Nevada PERS account was a reasonable method of distributing marital assets to offset Michele's lower wage-earning capacity and to account for her contributions to the marital estate. And, given that the District Court deferred distribution of the marital portion of the pension until payout of the benefit, it did not abuse its discretion in applying the time-rule method of valuation. In re Marriage of Swanson , 2004 MT 124, ¶ 23, 321 Mont. 250, 90 P.3d 418. The time-rule method is appropriate when there is either "[a] lack of marital assets to offset the present value of the accounts, or ... difficulty in ascertaining the present value of the accounts." Swanson , ¶ 25.
¶ 69 But the court chose an odd means to secure Michele's apportioned share of the estate by requiring Michele to insure Michael's life. The court did not discuss life insurance premiums or Michael's life expectancy in analyzing whether Michele's 51.57% share of the marital ***309 estate would cover the amount she likely will need to preserve the PERS benefit value. Michael was 57 at the time of trial. He had paid $14,100 in life insurance premiums since the date of separation, and he was expected to pay $4,700 for one additional year of premiums. If the premiums never increased-which they most certainly will-Michele's extra share of the marital estate would cover about twelve years, or until Michael is 70.[1] There is no evidence in the record about anticipated premiums or life expectancies, as neither party proposed this means of addressing the PERS benefits. In my view, once the court determined that the present value method could not be used for distribution of the PERS account, it should have better accounted for the contingencies and the burden on Michele to secure the value of her distribution.
¶ 70 Second, the Court rejects Michele's argument about the decline in her credit score because the District Court addressed it in finding that Michele still should have adequate resources to obtain suitable housing. Opinion, ¶ 33. Michele points out, however, that Michael simply quit paying the parties' joint mortgage after March 2015. By this time, the petition for dissolution had been filed and a temporary economic restraining order issued under § 40-4-121(3), MCA. "The purpose of the law requiring a temporary restraining order is clearly to maintain the status quo with respect to all property of the parties. The statute is expansively worded to capture any property, real or personal, along with any inchoate right to property as the beneficiary of 'any insurance or other coverage.' " Briese v. Mont. Pub. Emps. Ret. Bd. , 2012 MT 192, ¶ 25, 366 Mont. 148, 285 P.3d 550. We recognized in Briese that the economic restraining order "mitigates the potential harm to spouses and children caused by the dissolution process itself and ensures that reasonable provision is made for the spouse and children during the litigation." Briese , ¶ 25. Michael's unilateral decision to discontinue the mortgage payments did not meet his responsibility to preserve the assets of the marital estate, and it damaged Michele's *521 credit score. The remedy for violation of an economic restraining order typically is a contempt action. Briese , ¶ 38. Michael's disregard of his obligation to preserve the marital estate during the pendency of dissolution proceedings could have been addressed in that fashion. The District Court made extensive findings about the marital home, including Michele's refusal to agree to drop ***310 the sale price, and Michele has not demonstrated another remedy the court should have awarded for the drop in her credit score.
¶ 71 In the context of the District Court's entire analysis, although these points may not rise to an abuse of discretion, that threshold is reached in my view, when combined with the trial court's decision to apply two different standards in valuing the marital estate.
¶ 72 The Court recognizes that only "unique circumstances" will modify the generally accepted rule that "the value of the marital estate should be determined at or near the time of dissolution." Opinion, ¶ 58; Hochhalter , ¶ 17 (internal quotations and citation omitted). Valuing the marital assets at the time of separation may be appropriate when the parties lived apart and "maintained separate financial and retirement accounts, made separate financial decisions, and contributed neither monetary nor nonmonetary resources to each other." Hochhalter , ¶ 18 ; see, e.g. , Tipton , ¶ 24 (holding that the marital estate should be valued on the date of separation when the parties did not live in the same household or commingle their assets); Thorner , ¶ 37 (holding that unique circumstances existed when husband and wife "began managing their finances separately and eventually lived separately"). Key characteristics of financial separation include the filing of separate tax returns and the lack of financial contribution from one spouse to the other. Hochhalter , ¶ 19. Compare In re David , 2009 MT 422, ¶ 21, 354 Mont. 44, 221 P.3d 1209 (upholding valuation on date of dissolution for computing the value of wife's interest in husband's future retirement benefits).
¶ 73 For three years following separation, Michael retained a term life insurance policy, and Michele remained the primary beneficiary.[2] Michael testified that from August to October 2014, he voluntarily paid Michele $2,800 a month as "support," from what he calculated to be her share of the Nevada PERS account. In March 2015, the PERS payment increased and Michael paid Michele $2,849.34 per month. Michael voluntarily paid Michele that amount through January 2016. In February 2016, the District Court ordered an increase in temporary maintenance to Michele, and Michael began to pay her $4,500 a month. Michael also paid Michele's health insurance during the pendency of the dissolution action, and he funded the parties' health savings ***311 account, to which Michele had full access.
¶ 74 Michael further testified that during the separation he controlled all the investments he and Michele had made during the marriage. He also had full control over his income that he previously shared with Michele. Michele did not manage any of the marital assets, and Michael admitted that he controlled every single marital asset that accumulated during the separation (except Michele's own life insurance account). Michele and Michael filed a joint tax return for 2015 and retained the same accountant. The accountant testified that the parties also should file a joint tax return for 2016.
¶ 75 Michele and Michael did not maintain or manage separate finances. Though they did have separate bank accounts following the separation, their finances were managed together when they used the same accountant and filed joint tax returns. Michael contributed monetary resources to Michele after the separation when he voluntarily paid her interim support and when the District Court ordered temporary support payments in a specified amount. Michael also contributed health insurance and full access to a health savings account. Michele and Michael were not making separate financial decisions; Michael was making all the decisions regarding the finances and marital assets, and Michele was making no decisions.
*522 ¶ 76 Michael's control of the parties' finances and his unilateral and court-imposed decisions regarding how much he paid to support Michele while the dissolution action was pending do not establish the "unique circumstances" of financial separation that we have held justify valuing marital assets at the time of separation.
¶ 77 I would conclude that the District Court should have valued all of the marital estate, not just portions of it, at the time of dissolution rather than on the date of separation. The assets the court valued at the time of separation were four retirement accounts, all of which the District Court awarded to Michael in the final decree. The valuation difference resulted in Michael being awarded an additional $105,636.60 from the increased values of those accounts. This added amount far exceeded what the District Court purported to award Michele as an added share of the marital estate to cover the cost of insuring Michael's life. From these combined impacts, I would conclude that the District Court abused its discretion. I would reverse for the court to apply the retirement account values at the time of dissolution and to reapportion the distribution to account for Michele's cost to secure her entitlement to the awarded value of the PERS account.

In her original motion for declaratory judgment, Michele erred in reciting the dates and counting the days at issue, stating the parties signed the Premarital Agreement on August 9, 1991, "less than a week before their marriage" on "August 19, 1991." Subsequently, in its order enforcing the Premarital Agreement, the District Court stated the parties executed the agreement "nine days" before the scheduled wedding. We note the District Court erred by stating the parties executed the agreement "nine days" before the wedding because the parties executed the Premarital Agreement on August 9, 1991, and married seven days later, on August 16, 1991. We correct the District Court's finding to "one week" and analyze the agreement's enforceability based on that timeline.

Michael asserts that certain cases upon which Michele relies, specifically Sogg v. Nev. State Bank , 108 Nev. 308, 832 P.2d 781, 783-84 (1992), and Fick , 851 P.2d at 449, are inapplicable to the Premarital Agreement's enforceability because they were not Nevada law "in effect" when the parties executed the agreement-Nevada enacted the UPAA in 1989, Michael and Michele executed the Premarital Agreement in 1991, and the Nevada Supreme Court subsequently decided Sogg and Fick .
A "judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction." K&P Homes v. Trust , 398 P.3d 292, 294 (Nev. 2017) (quoting Rivers v. Roadway Express, Inc. , 511 U.S. 298, 312-13, 114 S.Ct. 1510, 1519, 128 L.Ed.2d 274 (1994) ). When a court "construes a statute, it is explaining its understanding of what the statute meant continuously since the date when it became law."K&P Homes , 398 P.3d at 294 (quoting Rivers , 511 U.S. at 313 n.12, 114 S.Ct. at 1519 n.12, and citing United States v. City of Tacoma , 332 F.3d 574, 580 (9th Cir. 2003) ("The theory of a judicial interpretation of a statute is that the interpretation gives the meaning of the statute from its inception, and does not merely give an interpretation to be used from the date of the decision.") ). Accordingly, all Nevada cases interpreting the UPAA are applicable to the Premarital Agreement's enforceability, regardless of when the cases were decided.
Further, pre-UPAA common law deeming premarital agreements unenforceable if they are "unconscionable, obtained through fraud, misrepresentation, material nondisclosure or duress" and providing for a presumption of fraud in favor of a greatly disfavored party is not applicable to our analysis here because the UPAA superseded those common law rules. See Fick , 851 P.2d at 449 (quoting Buettner v. Buettner , 89 Nev. 39, 505 P.2d 600, 604 (1973) ); Sogg , 832 P.2d at 783-84 (quoting the same).

C.f. § 40-2-608(1)(b), MCA (providing a premarital agreement is unenforceable if the agreement was unconscionable when executed and , before execution of the agreement, the party challenging the agreement (1) was not provided a fair and reasonable disclosure, (2) did not voluntarily and expressly waive disclosure rights, and (3) did not have or reasonably could not have had adequate knowledge of the other's property and financial obligations).

See, e.g. , Minn. Stat. § 519.11(1) ; N.J. Stat. § 37:2-38(c)(1) ; Blige v. Blige , 283 Ga. 65, 656 S.E.2d 822, 826 (2008) ; DeMatteo v. DeMatteo , 436 Mass. 18, 762 N.E.2d 797, 806 (2002).

Some states specifically require a disclosure to include an estimate of property value. See, e.g. , Colo. Rev. Stat. § 14-2-309(4)(a) ("A party has adequate financial disclosure [if the party receives] a reasonably accurate description and good-faith estimate of value of the property ...."); Gross v. Gross , 11 Ohio St.3d 99, 464 N.E.2d 500, 506 (1984) (requiring a full disclosure or full knowledge and understanding of the nature, value, and extent of each party's property); Randolph v. Randolph , 937 S.W.2d 815, 817 (Tenn. 1996) (requiring each party to make a full and fair disclosure of the nature, extent, and value of his property).

The District Court's 51.57% allocation to Michele gave her $59,725.49 more than Michael of the net marital estate value.

This arrangement was required by operation of § 40-4-121(3)(b), MCA. See Volk v. Goeser , 2016 MT 61, ¶ 23, 382 Mont. 382, 367 P.3d 378 ("The plain language of subsection (b) is quite broad, restraining both parties from unilaterally 'changing the beneficiaries of any ... coverage ... held for the benefit of a party.' " (quoting Briese , ¶ 25 ) ).