No. 00-821

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 242

IN RE THE CUSTODY OF:

SAWYER THOMAS ARNESON-NELSON,

a minor child.

DEBBIE M. ARNESON-PENGRA,

Petitioner and Respondent,

v.

MARK EDWARD NELSON,

Respondent and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kathryn S. Syth, Gillen, LaRance & Syth, P.C., Billings, Montana

For Respondent:

Debbie M. Arneson-Pengra (pro se), Helena, Montana

Submitted on Briefs: June 7, 2001
Decided: December 4, 2001

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 Mark Edward Nelson appeals from the June 8, 2000, Order of the First Judicial District Court, Lewis and Clark County. We affirm.

¶2 We find the following issues dispositive:

¶3 1. Whether the District Court erred in amending the prior parenting plan to suspend Nelson's visitation rights?

¶4 2. Did the District Court err in failing to appoint a guardian ad litem?

¶5 3. Whether Nelson's Due Process and Equal Protection Rights were violated?

## BACKGROUND

¶6 This case arises out of an entrenched custody and child support dispute between Debbie M. Arneson-Pengra (Pengra) and Mark Edward Nelson (Nelson). Pengra and Nelson are the parents of Sawyer Thomas Arneson-Nelson (Sawyer) and have never been married to each other. Sawyer was born on August 3, 1994.

¶7 The legal wrangling began when Pengra filed a motion for custody and child support on February 23, 1995. Sawyer was just over six months old at the time. In the ensuing six years, Pengra and Nelson have waged a protracted battle over custody and visitation rights. Throughout this time, the parties have inundated the District Court with what it labeled as a "constant barrage" of communications, motions and requests.

¶8 During the course of this dispute, Nelson has had a history of verbally abusive

altercations with Pengra, the court and mediators. The District Court specifically noted Nelson's hostility and aggressiveness toward Pengra and her boyfriend when it held Nelson in contempt for violating an order that prohibited the parties from speaking with each other.

¶9 The court gave Pengra temporary custody of Sawyer on April 24, 1995, and Nelson visitation rights. Approximately four months later, the court ordered both parties to submit to psychological evaluations to assist in the custody determination. Judge Jeffrey M. Sherlock entered a custody order on January 24, 1996, noting the extreme hostility between the parties. The order provided that Pengra and Nelson have joint custody of Sawyer. Pengra was to have physical custody, while Nelson was to have specified visitation rights. The District Court ordered the parties to exchange Sawyer at a neutral observer's residence.

¶10 Due to an inflammatory letter Nelson wrote and sent to him, Judge Sherlock eventually recused himself from this case. On April 23, 1997, Judge McCarter assumed jurisdiction of the case and ordered that a member of the sheriff's office be present at the parties' exchanges of Sawyer.

¶11 On May 14, 1997, the District Court ordered an investigation and report on the circumstances of the custody arrangement. The custody reevaluating report was issued on June 4, 1997. In their report, the doctors stated that Nelson was verbally aggressive toward Pengra and the neutral observers. The study indicated that these outbursts had a negative effect on Sawyer. It also noted, however, that Sawyer was not frightened of his father, except during Nelson's outbursts.

¶12 On April 19, 1999, the District Court entered the Final Parenting Plan. The court gave Pengra primary custody of Sawyer and the authority to make all decisions regarding his care. Nelson was allowed specific visitation rights. The District Court also ordered Pengra to undergo counseling to improve her parenting skills and Nelson to undergo anger management counseling. We affirmed the plan in *In re Custody of Arneson-Nelson*, 2000 MT 31N, 299 Mont. 545, 4 P.3d 1218.

¶13 Pengra filed a Motion for an Ex Parte Order and Hearing on March 21, 2000, asking the court to suspend Nelson's visitation rights. Nelson was provided a Notice of Hearing for Ex Parte Motion on March 16, 2000. On March 21, 2000, the District Court reviewed the motion. Both parties were present at the courthouse. Later that day, the court issued an

Ex Parte Order suspending all of Nelson's contact with Sawyer and set a hearing on the matter for May 4, 2000.

¶14 At the hearing, both parties were allowed to put on and cross-examine witnesses. On June 8, 2000, the District Court entered an Order that suspended all physical contact between Nelson and Sawyer. Instead, the court limited Nelson's contact with Sawyer to phone calls, email and mail. Nelson appeals the Order.

## STANDARD OF REVIEW

¶15 We review a district court's findings relating to custody modification to determine whether those findings are clearly erroneous. *See In re Marriage of Johnson* (1994), 266 Mont. 158, 166, 879 P.2d 689, 694 (citation omitted). Findings are clearly erroneous if they are not supported by substantial evidence, the court misapprehends the effect of the evidence, or this Court's review of the record convinces it that a mistake has been made. *See Johnson,* 266 Mont. at 166-67, 879 P.2d at 694 (citation omitted). We will reverse a district court's decision to modify custody or visitation only where an abuse of discretion is clearly demonstrated. *In re Marriage of Hunt* (1994), 264 Mont. 159, 164, 870 P.2d 720, 723.

## ISSUE ONE

¶16 Whether the District Court erred in amending the prior parenting plan to suspend Nelson's visitation rights?

¶17 A court may, in its discretion, amend a prior parenting plan if it finds that there has been a change in circumstances of the child and that a change is necessary for the best interests of the child. *See* § 40-4-219(1), MCA. In making this determination, the District Court relies on facts that arose after the prior parenting plan or that the court was unaware of at the time of the prior plan. *See* § 40-4-219(1), MCA.

¶18 The hearing to determine whether to amend Sawyer's parenting plan was largely a battle of conflicting testimony. Pengra put on evidence to show that Nelson's behavior has negatively affected Sawyer. Pengra's primary witness was Joyanna Silberg, PhD., a Senior Psychologist at the Sheppard and Enoch Pratt Hospital in Baltimore, Maryland. Dr. Silberg testified that Sawyer was seriously emotionally disturbed and opined that the source of these problems was Sawyer's fear of his father and Nelson and Pengra's

hostilities toward each other.

¶19 Nelson countered this testimony with his primary witness, Scott Harris. Harris was the Montana Department of Public Health and Human Services' caseworker assigned to the case. He testified that he had investigated several allegations of child abuse by Nelson, but found no evidence of abuse. Nelson also testified on his own behalf.

¶20 Following the hearing, the District Court found that "any form of attempted co-parenting is impossible without causing further and continuing harm to Sawyer" and that "[Nelson] is causing harm to Sawyer by refusing to assist in, and attempting to frustrate, Sawyer's mental health therapy and by refusing to cooperate with the professionals involved in Sawyer's life." The court went on to find that "it is in Sawyer's best interest to suspend [Nelson's] physical contact with Sawyer" and that "[a]ny visitations between [Nelson] and Sawyer shall be at [Pengra's] sole discretion."

¶21 Nelson argues that the court's findings are not supported by substantial credible evidence and that the court misapprehended the effect of this evidence. He thus contends that the court's findings were clearly erroneous. We disagree.

¶22 We begin our analysis by reiterating that "[t]he trial court is in a better position than this Court to resolve child custody issues. The district court's decision is presumed correct and will be upheld unless a clear abuse of discretion is shown." *Fitzgerald v. Brown (In re Custody of J.M.D.)* (1993), 259 Mont. 468, 473, 857 P.2d 708, 712. It is the function of the district court to resolve conflicts regarding evidence. *See In re Marriage of Penning* (1989), 238 Mont. 75, 78, 776 P.2d 1214, 1216.

¶23 Pengra's primary witness, Dr. Silberg, testified that Sawyer was severely disturbed and that he did not feel safe at his father's home. During her evaluation of Sawyer, she noted that he displayed a number of dissociative symptoms such as confusion in memory and rapid changes in mood, behavior and cognition. Dr. Silberg testified that Sawyer's emotional condition worsened between her first and second evaluations.

¶24 Most disturbing, at her second evaluation of Sawyer, Dr. Silberg inquired about the pain he experienced when urinating. Her report noted his response: "I was in the bathroom and the bad people put a screwdriver in like this (he touched his penis). They taped it on. The bad people heard my crying and told me to stop but I could not stop crying." She noted in her report that, while the specific events that Sawyer relayed to her were

improbable, he was reporting some form of purposefully inflicted trauma and that Sawyer appears convinced that there are people that intend to hurt him. In her testimony, she recommended that the court continue to suspend Nelson's visitation rights with Sawyer until Nelson receives mental health therapy.

¶25 Nelson argues that the District Court should not have entertained Dr. Silberg's testimony. He argues that § 40-4-219, MCA, barred Dr. Silberg's testimony concerning matters prior to the original parenting plan. We disagree. The statute clearly requires the district court to "consider post-decree facts, as well as pre-decree facts unknown to the trial court at the time the decree was entered, in determining both the 'change in circumstances' and the 'best interests' requirements." *In re Marriage of Sarsfield* (1983), 206 Mont. 397, 413, 671 P.2d 595, 604. Dr. Silberg's testimony and report were not introduced at the time of the original parenting plan because Dr. Silberg was unavailable for cross-examination. Therefore, Dr. Silberg's testimony was unknown to the District Court at the time of the original plan.

¶26 Nelson also contends that the District Court erred in allowing Dr. Silberg to testify as an expert witness. He argues that Dr. Silberg did not possess adequate knowledge to make an expert opinion, in part, because she never interviewed Nelson nor reviewed Sawyer's pediatric records, although she did speak to Sawyer's pediatrician. Furthermore, Nelson argues that Dr. Silberg's knowledge of the situation was biased as it was provided by Pengra.

¶27 Again, we disagree. The role of determining the qualification and competency of an expert witness rests largely with the trial judge, and we will not disturb that determination without a showing of abuse of discretion. *See Cottrell v. Burlington N. R.R.* (1993), 261 Mont. 296, 301, 863 P.2d 381, 384 (citations omitted). Dr. Silberg has extensive experience in evaluating and treating children with serious emotional disturbances. Dr. Silberg evaluated Sawyer at her office in Baltimore in January 1999, and conducted a follow-up assessment in Helena, Montana, in February 2000. She also interviewed Pengra and consulted numerous documents, including school, legal and therapy records. She testified that many of these sources provided objective information concerning Nelson's anger control in front of Sawyer. Given this testimony, we cannot conclude that the District Court abused its discretion in allowing Dr. Silberg to testify. *See State v. Hocevar*, 2000 MT 157, ¶60, 300 Mont. 167, ¶60, 7 P.3d 329, ¶60 (holding that an expert could base diagnosis on review of medical records, investigative statements and information concerning defendant).

¶28 Nelson further argues that the District Court misapprehended the evidence presented. He contends that it is Debbie's, not his, hostility that has resulted in harm to Sawyer. Nelson's primary witness, Harris, testified that he had observed Sawyer with Nelson for several hours and witnessed no harmful interaction between them. Furthermore, he testified that he saw no reason to discontinue Nelson's access to Sawyer. On cross-examination, Harris testified that he did not have the training to even attempt to diagnose a child with a dissociative disorder and that he would not argue with a nationally known psychologist on the subject.

¶29 The District Court was clearly faced with contradictory evidence concerning Sawyer's mental health and Nelson's affect on that health. It is the role of the district court, however, to untangle conflicting evidence. *See Penning*, 238 Mont. at 78, 776 P.2d at 1216. Reviewing the record, we cannot conclude the District Court's findings are clearly erroneous.

¶30 Sawyer finally argues that the District Court's failure to make the specific finding of a "change in circumstances" constituted error. As we noted above, a district court may amend a prior parenting plan if it finds a "change has occurred in the circumstances." *See* § 40-4-219(1), MCA. Here, the District Court made numerous findings relating to Sawyer's emotional well-being. While the court did not make a specific finding that there was a "change in circumstances," we conclude, upon a review of the court's Order, that the court implied such a finding. In particular, the District Court noted that "[t]estimony indicated that Sawyer has improved significantly since March 21, 2000, when Mark's visitations were suspended." Our conclusion does not lower the requirement that there be a change in circumstances to amend a prior parenting plan. Instead, we simply conclude that the District Court's failure to specifically cite the words a "change in circumstances" is, at most, harmless error. *See* Rule 61, M.R.Civ.P.; *see also In re Marriage of Abrahamson* (1996), 278 Mont. 336, 343, 924 P.2d 1334, 1338 (holding that the district court's failure to explicitly mention § 40-4-212(3)(a), MCA, constituted, at most, harmless error).

¶31 For the reasons set forth above, we conclude that the District Court's findings were not clearly erroneous and it did not abuse its discretion in amending the prior parenting plan.

## ISSUE TWO

¶32 Did the District Court err in failing to appoint a guardian ad litem?

¶33 Nelson argues that the court erred in amending the parenting plan without first appointing a guardian ad litem. His rationale is that both parties asked for a guardian ad litem and that the court should not have made such a significant decision as to Nelson's parenting rights without first appointing a guardian ad litem. Nelson does not cite any authority for his position.

¶34 Section 40-4-205, MCA, states that a "court *may* appoint a guardian ad litem to represent the interests of a minor dependent child with respect to the child's support, parenting, and parental contact." (Emphasis added). We have consistently held that this is not a mandatory statute, and such an appointment is discretionary with the court. *See Fitzgerald*, 259 Mont. at 476, 857 P.2d at 714; *In re Marriage of Johnston* (1993), 255 Mont. 421, 428-29, 843 P.2d 760, 764; *Merriman v. Merriman (In re Marriage of Merriman)* (1991), 247 Mont. 491, 496, 807 P.2d 1351, 1354. Here, the District Court considered Nelson's request, but denied it stating that "[t]he Court is unwilling to place anyone else in danger of Mark's threatening and aggressive behavior." We therefore conclude that the District Court did not abuse its discretion in not appointing a guardian ad litem.

## ISSUE THREE

¶35 Whether Nelson's Due Process and Equal Protection Rights were violated?

¶36 Nelson argues that the hearing before the District Court violated the Due Process Clause and that the District Court's subsequent restriction of Nelson's visitation rights violated the Equal Protection Clause. In asserting both claims, Nelson essentially argues that his visitation rights implicate natural parenting rights to care and custody of a child. He asserts that such rights are fundamental rights that are protected by both the Due Process and Equal Protection Clauses of the United States and Montana Constitutions. The District Court's hearing and findings, according to Nelson, must therefore undergo constitutional analysis. Nelson initially raised these claims in his Motion for Supervisory Control, but we dismissed Nelson's motion without ever addressing the merits. Therefore, we now turn to these issues for the first time.

¶37 A constitutional issue is waived if not presented at the earliest opportunity. *See Billings Deaconess Hosp. v. Angel* (1986), 219 Mont. 490, 495, 712 P.2d 1323, 1327; *Dodd v. City of East Helena* (1979), 180 Mont. 518, 523, 591 P.2d 241, 244. Nelson never objected at the hearing or in any post-hearing motions to the District Court that the hearing

violated the Due Process Clause nor that any restriction of his visitation rights may violate the Equal Protection Clause. Instead, Nelson first brought these claims before this Court. We conclude that Nelson did not raise these claims at the earliest opportunity and therefore waived them.

¶38 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

Justice Patricia Cotter dissents.

¶39 I concur with the majority's conclusion as to Issue 2. However, I respectfully dissent from the majority's conclusions as to Issue 3, and Issue 1 to the extent the District Court exceeded the scope of Pengra's Motion for an Ex Parte Order.

¶40 In Pengra's filings to the court, she requested an Ex Parte Order immediately suspending Nelson's visitation rights, and further moved the District Court to set a hearing to make the suspension permanent. She requested an additional hearing in six months to determine whether supervised visits could then renew. At no time did Pengra request sole custody of Sawyer. In its order granting the immediate suspension, the District Court explained that Pengra "requested a hearing to make the suspension permanent until further evidence was established."

¶41 The District Court concluded that concerns for Sawyer's safety warranted immediate suspension of visitation between Nelson and Sawyer until the various professionals could be heard, and scheduled a hearing to take place approximately two weeks later. There was no notice from either the court or Pengra that Pengra could be granted sole custody of Sawyer or that Nelson's visitation rights could be permanently suspended without means

for re-evaluation.

¶42 In its order suspending visitation permanently, the District Court went beyond the relief Pengra had originally requested. The District Court suspended all physical contact between Nelson and Sawyer indefinitely. Although Pengra had initially asked the court to later hold a hearing to review Nelson's progress and determine if visitation could then be re-instituted, the court did not make any such provision in its Final Order, instead granting Pengra the sole right to decide what, if any, contact Nelson could ever have with Sawyer in the future. Considering the extensive animosity between these parents, this order in effect terminated Nelson's rights of visitation, as it is extremely unlikely Pengra will ever agree to allow visitation of any kind.

¶43 Moreover, although not specifically mentioned in the majority Opinion, the District Court also granted Pengra sole custody of Sawyer, even though she had not requested such relief.

¶44 "In marital cases, as in other cases, the essential elements of due process are notice and an opportunity to be heard." *In re Marriage of Huotari* (1997), 284 Mont. 285, 291, 943 P.2d 1295, 1299 (a father's right to procedural due process was denied when a district court went beyond the matter before it) (citation omitted). "[I]f a permanent change in custody appears to the court to be necessary, then due process requires that an application be made for that purpose and proper notice of such application be given." *State ex rel. Shelhamer v. District Court* (1972), 159 Mont. 11, 15, 494 P.2d 928, 930 (in a proceeding for nonsupport and contempt, it was error for the court to change custody provisions). The requirement that all issues to be tried must be raised in the pleadings applies to child custody disputes, and a District Court does not have jurisdiction to grant relief outside of the issues presented by the pleadings, without agreement of the parties. *Matter of Custody of C.J.K.* (1993), 258 Mont. 525, 527, 855 P.2d 90, 91 (issue of immediate primary physical custody of a child was not properly before the court for its ruling) (citations omitted).

¶45 Neither Pengra's motion, nor the notice of hearing alerted Nelson that he stood to lose both his right of joint custody and his right of continuing visitation with his son on a permanent basis. While the majority concludes that Nelson's due process arguments were waived for his failure to raise them below, the fact is that the District Court orders exceeding the relief sought by Pengra were not entered until June 8, 2000, over a month after the hearing which was held to address only the relief sought by Pengra. Moreover,

we have consistently held that "a natural parent's right to care and custody of a child is a fundamental liberty interest, which must be protected by fundamentally fair procedures." *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12 (citation omitted). Nelson was not accorded fundamentally fair procedures here, and I would not conclude he has waived his right to those procedures.

¶46 I would reverse the District Court's order and remand for a full hearing, requiring Pengra to set forth specifically in her pleadings the relief she seeks, and giving Nelson a full opportunity to present evidence and argument against the prospect of a change in custody and the permanent suspension of his visitation rights.

/S/ PATRICIA COTTER

Justices Jim Rice and Terry N. Trieweiler concur in the foregoing dissent.

/S/ JIM RICE

/S/ TERRY N. TRIEWEILER