FILED

08/19/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0549

DA 24-0549

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 187

IN RE THE MARRIAGE OF:

HEIDI MARIE BOESHANS,

      Petitioner and Appellee,

  and

JOSEPH RYAN BOESHANS,

      Respondent and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DR-23-797
Honorable Brett Linneweber, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

        Michael C. Doggett, Doggett Law Offices, PLLC, Missoula, Montana

     For Appellee:

        Katherine Delaney Berst, Berst Law Firm, PLLC, Billings, Montana

                 Submitted on Briefs:  July 16, 2025

                      Decided:  August 19, 2025

Filed:

            _____
                    Clerk

Justice Katherine Bidegaray delivered the Opinion of the Court.

¶1      Joseph Ryan Boeshans (Joseph) appeals the August 2024 Findings of Fact, Conclusions of Law, Final Dissolution Decree, and Final Parenting Plan of the Montana Thirteenth Judicial District Court, Yellowstone County.  We address the following restated issues:

1. *Was the District Court's finding that Joseph failed to make full financial disclosures clearly erroneous?*

2. *Did the District Court abuse its discretion when it conditioned parenting time on chemical dependency and mental health evaluations?*

3. *Did the District Court equitably distribute the parties' business when it awarded Heidi full ownership?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      Joseph and Heidi Boeshans (Heidi) were married in October 2020 and have one child, born in August 2022.  Both also have children from prior marriages.  Heidi works for First Interstate Bank and is near completing an MBA and Joseph is an engineer.  Heidi owned their home prior to the marriage, and the mortgage was in her name.  In February 2023, the couple purchased Boesh Engineering (registered as J.R. Boeshans Engineering, PLLC) from Joseph's parents for full market value.  To finance the purchase, they took out a home equity line of credit (the HELOC) for $100,000.  They spent approximately $35,000 to pay off Joseph's premarital credit card debt so they could qualify for an SBA loan and approximately $25,000 to finance the SBA loan.  The couple maxed out the HELOC on

2

personal expenses. The couple then obtained an SBA loan for $590,000[1] to purchase the business name and assets, using Heidi's premarital home as security.

¶3    After separating in June 2023, Heidi petitioned for divorce in late July 2023. The parties appeared with counsel at a hearing in August 2023 where they recorded an interim stipulation requiring, as pertinent: (1) no contact except through the "Our Family Wizard" app and only concerning the child; (2) Heidi to have primary residential custody of the child and Joseph to have limited parenting time on condition he not use alcohol or marijuana prior to or during; (3) Joseph to pay Heidi monthly child support in an amount to be calculated by Child Support Services Division (CSSD) after income disclosures; (4) division of expenses, including that Joseph must pay interest on the portion of the HELOC used to finance the purchase of the business; and (5) surrender of all business accounting to a third-party, that neither party make any draws from the business or use business cards for non-legitimate purposes or personal use, and that Joseph continue receiving his salary and reimbursement for legitimate business expenses.[2] The parties reduced their oral stipulations to writing in September 2023, and the District Court entered a conforming order shortly after.

---

[1] The Findings of Fact, Conclusions of Law, and Final Decree indicate the SBA loan amount was $175,000. However, Heidi testified and provided documentary evidence that the SBA loan amount was $590,000. The $660,000 purchase price breakdown was $175,000 for hard assets and approximately $485,000 for goodwill, customer lists, and lab accreditation.

[2] These stipulations were in addition to a temporary economic restraining order issued in early August 2023.

¶4 Almost immediately after the court's conforming order, Heidi filed a motion for contempt. After a hearing where numerous witnesses testified, the District Court found Joseph in contempt for: contacting Heidi about the business through the Our Family Wizard app and going to her home without permission; failing to make child support or HELOC interest payments; and writing thousands of dollars in business checks to family, employees, and friends that he could not reconcile with any actual business expenses. The court ordered Joseph to surrender all business cards and checkbooks to Heidi's attorney pending hiring a new accountant. Heidi later filed another motion for contempt based on Joseph's failure to surrender the business cards and checkbooks as ordered. At a hearing, the District Court found Joseph in contempt again and ordered him to turn over the items within 24 hours or face arrest.

¶5 In February 2024, Heidi filed a third contempt motion, alleging, among other things, that Joseph did not surrender all business cards, continued to take unauthorized draws from the business account, failed to make support or interest payments, and was intoxicated and hostile at numerous exchanges. The court held a hearing on the motion in March 2024, where Joseph surrendered another business credit card. The court took the matter under advisement and did not immediately issue a ruling.[3] In April 2024, Joseph removed Heidi's access to the business accounts, so Heidi filed a motion requesting access. The District Court ordered that Joseph immediately reestablish and maintain Heidi's access to the business accounts. Also in April 2024, Joseph's fourth lawyer withdrew based on Joseph

---

[3] The District Court later formally found Joseph in contempt in its August 2024 findings of fact, conclusions of law, and final decree.

perjuring himself at the third contempt hearing. Joseph did not retain new counsel and instead proceeded to trial pro se, filing a proposed settlement agreement, parenting plan, and findings and conclusions pretrial.

¶6 The District Court held a three-day trial on August 1, 2, and 9, 2024. Heidi testified that, under the stipulated interim parenting plan, Joseph could have parenting time for two-hour blocks Monday through Friday and four-hour blocks Saturday and Sunday, with 24-hours' notice. She kept a log of Joseph's parenting time. Joseph's exercise of parenting time was "hit or miss" and "random" and he did not typically request to see their child except every other week, when he also had custody of his other daughter from a prior marriage. Heidi believed that Joseph timed parenting time so his other daughter could babysit. Joseph had never cared for their 23-month-old child overnight, and Heidi thought they were not bonded. Joseph went for up to three weeks without seeing the child at all. Heidi submitted as evidence 3,800 pages of Our Family Wizard app transcripts without objection. In the messages, Joseph vacillated between demanding 50/50 custody to agreeing to "a graduated parenting plan . . . week on week off when [the child] is 3 or 4" and to be "100% solber [sic]."

¶7 Heidi also raised safety concerns. Joseph continued to have issues with being intoxicated at exchanges, which took place at the Yellowstone County Sheriff's office so that Joseph could submit to a breathalyzer test. Once, in February 2024, Heidi received text messages and photos from an employee showing Joseph drinking on the job during a day when he was scheduled to have their child. At the exchange, Joseph smelled "profusely" of alcohol, so Heidi requested a breathalyzer. Joseph then grabbed the child

5

in the car carrier and ran out the door. He eventually brought the child back to the sheriff's office, setting her car carrier down just inside the door and leaving. Heidi later obtained surveillance footage of all their exchanges from September 2023 to August 2024, which she submitted as evidence. At another exchange, Joseph was "irate" and began screaming at Heidi and pounding on her car window while Heidi's two other daughters were inside, which scared the children. Heidi also disallowed parenting time while Joseph refused to purchase a new car seat after their child outgrew the infant seat.

¶8 As to his drug and alcohol use, Heidi provided dozens of photos of their garage at home where Joseph left beer bottles, caps, cigarettes, vaping supplies, marijuana, and marijuana paraphernalia strewn about and accessible to the small children in the home. Heidi testified that, during the marriage, Joseph spent most of his time in the garage, away from the family, drinking and smoking. She believed he was an alcoholic based on his being drunk by 10 a.m. and consuming a six- to twelve-pack of beer daily. Joseph was previously reprimanded by his parents and another employer for his alcohol use at work. Heidi and Joseph separated in June 2023 because of an incident at the Boesh Engineering lab, where Heidi's eldest daughter from a prior marriage was working for the summer. Joseph screamed at Heidi's 16-year-old daughter in front of men in the lab that she was "on her cycle," which sent her into hysterics. The daughter was too upset to drive them home, so Joseph drove intoxicated. Heidi testified that Joseph also drove drunk multiple times with his other daughter in the car. Heidi proposed that Joseph (and she) be subject to chemical dependency and psychological evaluations, and recommended treatment, if any, as a condition of parenting and that he maintain sobriety over a graduated parenting

6

schedule.  Otherwise, their child would be in imminent danger of physical, emotional, and psychological harm in Joseph's care.

¶9     Regarding the engineering business, Heidi testified that her premarital home secured the SBA and HELOC.  Liquidating the cash assets or selling the business outright would not offset the business-related debt.  Joseph did not have the means to remove the lien on Heidi's home because he had no assets for collateral, owed $46,000 in post-separation credit card debt, and was a credit risk after their bank discontinued the business line of credit.  Joseph allowed business rent, other bills, and employees to go unpaid, which Heidi corrected when she had access to business accounting.  Because Joseph failed to meet his financial obligations under the interim order and instead took unauthorized draws without paying down business liabilities, Heidi feared Joseph would default on the loan and she would lose her home.  Heidi proposed that she take ownership of the business and refinance the SBA to remove Joseph as an obligor within six months.  Heidi's business plan was to maintain lab certification, hire a professional engineer and new lab supervisor, and partner with her accountant father, who would oversee financials.

¶10    Joseph testified, denying that Heidi was capable or qualified to run the business, disparaging her chosen lab supervisor, and calling her business plan "absolutely ludicrous."  Joseph proposed instead that he retain sole ownership of the business, "move" the SBA loan within 60 days, and pay Heidi $100,000.  However, Joseph also testified repeatedly he was "completely broke" and had $46,000 in credit card debt with no valuable unencumbered assets.  Nevertheless, there were "multiple people . . . willing to partner"

7

with him based on his reputation as "the most knowledgeable asphalt engineer in the state" and he could "remove th[e] lien immediately" because his "credit is amazing."

¶11    Joseph denied taking unauthorized draws from the business account or failing in his payment obligations in violation of the parties' interim stipulation, which he argued was confusing and unduly limiting. Joseph claimed that CSSD told him there was no child support amount due. He disputed Heidi's claim that he took an unauthorized $60,000 from the business since the separation but admitted on cross-examination that, around the same time he cut off Heidi's access to the business accounting, he gave himself a $30,000 annual raise.[4]

¶12    Regarding parenting, Joseph wanted week-on/week-off custody of their child, to coincide with custody of his other daughter because the two children were very close. He believed Heidi made more money than him, and therefore, was not entitled to spousal or child support. While he admitted to smoking marijuana occasionally, he denied ever drinking or smoking around his children. He also denied ever drinking to excess or driving intoxicated. However, in letters he wrote to Heidi admitted into evidence, Joseph admitted to drinking too much and having issues controlling his anger.[5] Finally, although he had

---

[4] At the end of the first day of trial, the court ordered Joseph to immediately reinstate Heidi's access to the business accounting software. Upon gaining access that evening, Heidi discovered Joseph's raise.

[5] Joseph objected to admission of the letters because they were "not dated."

8

"anxiety," Joseph denied needing any chemical dependency or mental health evaluations or a stepped-up parenting plan.[6]

¶13 Countless times, Joseph challenged the court's prior findings regarding violations of the interim order, insisting that Heidi lied and made fraudulent accountings. Countless times, the District Court admonished Joseph that it would not relitigate its prior contempt findings. Heidi complained that Joseph did not timely provide required financial disclosures, and her counsel was often unfamiliar with Joseph's proposed exhibits. Joseph argued that he made the required disclosures in his proposed findings and conclusions, filed the day before trial. Joseph also separately filed a Final Disclosure Statement mid-trial on August 7, 2024. The clerk of court reported Joseph dropped off his disclosure "reek[ing] of alcohol" and incoherent, which prompted the court to administer a breathalyzer on the last day of trial. Based on Joseph's lack of candor and refusal to follow discovery rules, the District Court sanctioned him by disallowing admission of various exhibits and the testimony of his accountant witness.[7]

¶14 The District Court subsequently issued findings of fact, conclusions of law, a final decree, and incorporated final parenting plan. As pertinent, the court awarded Heidi primary physical and residential custody of their child. The parenting plan provided Joseph

---

[6] Joseph said he had a chemical dependency evaluation during his last divorce and separately testified that he had custody of his daughter from that marriage on condition that he not be intoxicated around her.

[7] The court also disallowed the witness based on Joseph's communicating with him during recess about Heidi's trial testimony, including showing him an exhibit. The record of refused exhibits shows that the witness would testify regarding the veracity of Heidi's allegations in her contempt motions. Joseph does not challenge these evidentiary sanctions.

9

graduated parenting time over 18 months, leading up to a 2-1 parenting schedule during which Joseph would have their child every third day. The plan required Joseph to submit to a breathalyzer test every time he exercised parenting time until he achieved one year of consecutive passed tests. The plan also required Joseph to complete court-ordered counselling, if professionally recommended, after undergoing chemical dependency and mental health evaluations. Finally, the court conditioned commencement of Joseph's parenting time on confirmation by evaluators that Joseph submitted to the required evaluations. The court ordered Joseph to "immediately contact" the court's Family Relations Department (and provided a contact email) to arrange the evaluations. The court stated it would issue a separate order after evaluations when the first phase of the parenting plan was to begin.

¶15     Based on the short duration of the parties' marriage, Heidi's owning the home since 2007, and Joseph's lack of contributions, the court awarded Heidi her premarital home and required her to pay the mortgage debt; and also awarded Heidi sole ownership of Boesh Engineering, requiring her to pay all the business debt. The court concluded that a sale of Boesh Engineering would not offset the debt and that Joseph was financially irresponsible and unable to remove the lien on Heidi's home securing the business purchase, which put the business and Heidi's premarital home at risk. Finally, based on Joseph's "repeated dishonesty and misconduct throughout the entirety of the proceedings," the court found that "[i]n all instances" where the testimony or evidence "clash[ed]," Heidi was more credible. Joseph timely appeals and is represented by counsel.

10

## STANDARD OF REVIEW

¶16 "We review a district court's factual findings pertaining to the division of marital assets and a parenting plan to determine if they are clearly erroneous." *In re Marriage of Tummarello*, 2012 MT 18, ¶ 21, 403 Mont. 91, 479 P.3d 982. We review a district court's orders on dissolution of marriage and parenting for an abuse of discretion. *In re Marriage of Thorner*, 2008 MT 270, ¶¶ 20-21, 345 Mont. 194, 190 P.3d 1063.

¶17 A finding of fact is clearly erroneous if not supported by substantial evidence, the lower court misapprehended the effect of the evidence, or we are firmly convinced a mistake was made. *In re D.L.L.*, 2025 MT 96, ¶ 6, 421 Mont. 487, 568 P.3d 565. An abuse of discretion occurs if a court exercises granted discretion based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Bessette v. Bessette*, 2019 MT 35, ¶ 13, 394 Mont. 262, 434 P.3d 894.

## DISCUSSION

¶18 *1. Was the District Court's finding that Joseph failed to make full financial disclosures clearly erroneous?*

¶19 Joseph contends that the District Court committed reversible error in finding that he failed to make required financial disclosures, which he says was contrary to the record. The trial took place on August 1, 2, and 9, 2024. Joseph asserts he complied with the discovery requirements of § 40-4-253, MCA, by filing a Final Disclosure Statement on

11

August 7, 2024. He further contends he is entitled to "a certain amount of leeway" because he was a pro se party.

¶20 Section 40-4-253, MCA, governs final disclosures in dissolution proceedings. It provides that "[e]ach party shall serve on the other party a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury, in the event that the case goes to trial, no later than 45 days before the first assigned trial date." Section 40-4-253(1)(a)(ii), MCA. "The final declaration of disclosure must include all material facts and information regarding the (a) characterization of all assets and liabilities; (b) valuation of all assets that are contended to be marital or for which it is contended that the marital estate has an interest; (c) amounts of all obligations that are contended to be marital obligations or for which it is contended that the marital estate has liability; and (d) expenses and earnings and accumulations of each party that have been set forth in the income and expense declaration." Section 40-4-253(2), MCA. "Along with the final declaration of disclosure, each party shall serve on the other party an updated income and expense declaration unless a current income and expense declaration is on file." Section 40-4-253(3), MCA. "The failure of a party to disclose an asset or liability on the final declaration of disclosure is presumed to be grounds for the court, without taking into account the equitable division of the marital estate, to award the undisclosed asset to the opposing party or the undisclosed liability to the noncomplying party." Section 40-4-253(4), MCA. If, within five years of the judgment, the court "discovers . . . that a party has committed perjury in the final declaration of disclosure," it may set aside part or

12

all of the judgment. Section 40-4-253(5), MCA.[8] "Time after time, this Court has held that discovery abuse will not be dealt with leniently and that the transgressors of discovery abuses should be punished rather than encouraged repeatedly to cooperate." *Cox v. Magers*, 2018 MT 21, ¶ 25, 390 Mont. 224, 411 P.3d 1271 (citation and punctuation omitted).

¶21 As a threshold matter, Joseph became pro se upon withdrawal of his fourth lawyer in April 2024, four months before the trial. He does not explain why he did not make the required disclosures during the prior ten months while represented by counsel. "While pro se litigants may be given a certain amount of latitude, that latitude cannot be so wide as to prejudice the other party, and it is reasonable to expect all litigants, including those acting pro se, to adhere to procedural rules." *Greenup v. Russell*, 2000 MT 154, ¶ 15, 300 Mont. 136, 3 P.3d 124. Rather than a case warranting "leeway," this is a case where Joseph's failure to make the mandatory financial disclosures fully and on time was unquestionably in bad faith. For example, Heidi did not discover that Joseph unilaterally gave himself a $30,000 raise until after the first day of trial, and even then, only because the court ordered him to immediately reinstate her access to the business accounting software, which the court expressly found Joseph cut off to conceal unauthorized draws. Joseph also did not disclose that he accumulated $46,000 in post-separation credit card debt until court-ordered

---

[8] *See also* § 40-4-252, MCA (governing preliminary disclosures).

13

mediation in July 2024, two weeks before trial, or that he received $338 in monthly disability income until he testified at trial.[9]

¶22 Joseph's last-minute Final Disclosure Statement, made between the second and third days of the trial, did not cure the prejudice Joseph caused to Heidi by his ongoing refusal to disclose, fully and on time, the financial information necessary for an equitable distribution of the marital estate. We hold the District Court's finding that Joseph failed to make full discovery disclosures was supported by substantial evidence and was not clearly erroneous.

¶23 *2. Did the District Court abuse its discretion when it conditioned parenting time on chemical dependency and mental health evaluations?*

¶24 Joseph contends that the District Court's parenting plan "permanently deprives [him] of his parental rights" and is "inscrutable" because it does not advise him of what he must do to obtain parenting time with his daughter. Our reading of the court's August 2024 findings of fact, conclusions of law, final decree, and final parenting plan reveals that Joseph "shall immediately contact" the court's Family Relations Department, "specifically, by emailing" a named person at a stated email address, to "arrange for an anger/risk assessment, mental health evaluation, and a chemical dependency evaluation." Then, once the court "receives notice from the evaluator(s)" that Joseph obtained these evaluations,

---

[9] At trial, Joseph argued that he fully disclosed his income and debt in his proposed findings of fact and conclusions of law, filed July 31, 2024, the day before trial. The filing did not disclose Joseph's $338 monthly disability income or any amount of credit card debt.

Phase One of the parenting plan will begin.[10]  At that time, the court will issue a separate order regarding counselling, if any, recommended as a result of the evaluations.  Phase One provides Joseph parenting time in approximate two-hour blocks Tuesdays and Thursdays and a four-hour block on Saturdays, on condition that Joseph attend all court-ordered counselling, if any, and pass a breathalyzer test at all exchanges, and lasts for six months.  Phase Two, also lasting for six months, provides for longer blocks on Tuesdays, Thursdays, and Saturdays, and additional parenting time on Fridays, also conditioned on Joseph's passing a breathalyzer.  If Joseph has completed one year of passed breathalyzer tests, that restriction is removed going forward.  Phase Three provides for additional overnight parenting time on some Fridays and also lasts for six months.  After 18 months, Phase Four begins, which provides for a 2-1 schedule where Joseph has parenting time every third day and on a specific holiday schedule.[11]  The parenting plan is not, as Joseph contends, "impossible to understand."

---

[10]  Joseph claims that the language of the final parenting plan is "impermissibly and unconstitutionally unclear."  It reads:

> Joseph shall have visitation in four consecutive phases with the parties' child as follows.  However, Phase One does not begin until the Court receives notice from the evaluator(s) that Joseph obtained his through the Thirteenth Judicial District Court's Family Relations Department that is concurrently ordered in the Decree.  Pending that confirmation, Joseph is barred from parenting the child.  The Court will issue a separate Order available for each party when Phase One begins.

In the decree, the court orders:

> Joseph shall immediately contact the Court's Family Relations Department (specifically by emailing [name omitted]@mt.gov).  Joseph shall arrange for an anger/risk assessment, mental health evaluation, and a chemical dependency evaluation.  Joseph must provide the evaluator with a copy of this Order, as well as any subsequent collateral information requested by the evaluator.

[11] We note, too, that the parenting plan separately provides that "[e]ach party shall be entitled to have reasonable phone contact" with the parties' child when in the physical care of the other party.

15

¶25 The parenting plan also does not constitute a "de facto termination of [Joseph's] parental rights." Instead, it conditions implementation of the plan, and thereby Joseph's parenting time with his child, on the condition that he receive professional evaluations for chemical dependency and mental health issues.

¶26 Section 40-4-212(1), MCA, provides a non-exhaustive list of criteria a court must consider in rendering a parenting plan that is in the child's best interest. These criteria are:

    (a)    the wishes of the child's parent or parents;

    (b)    the wishes of the child;

    (c)    the interaction and interrelationship of the child with the child's parent or parents and siblings and with any other person who significantly affects the child's best interest;

    (d)    the child's adjustment to home, school, and community;

    (e)    the mental and physical health of all individuals involved;

    (f)    physical abuse or threat of physical abuse by one parent against the other parent or the child;

    (g)    chemical dependency[12] or chemical abuse on the part of either parent;

    (h)    continuity and stability of care;

    (i)    developmental needs of the child;

    (j)    whether a parent has knowingly failed to pay birth-related costs that the parent is able to pay, which is considered to be not in the child's best interests;

---

[12] Defined at § 53-24-103(4), MCA, as "the use of any chemical substance, legal or illegal, that creates behavioral or health problems, or both, resulting in operational impairment," including "alcoholism, drug dependency, or both, that endanger the health, interpersonal relationships, or economic functions of an individual or the public health, welfare, or safety."

16

(k)     whether a parent has knowingly failed to financially support a child that the parent is able to support, which is considered to be not in the child's best interests;

(l)     whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests unless the court determines, after a hearing, that contact with a parent would be detrimental to the child's best interests; and

(m)     adverse effects on the child resulting from continuous and vexatious parenting plan amendment actions.

¶27     If, after a hearing, the court determines that "contact with a parent would be detrimental to the child's best interest," the court "may place conditions on visitation." *Wendlandt v. Johnson*, 2012 MT 90, ¶ 11, 365 Mont. 1, 277 P.3d 1208 (citing § 40-4-212(1)(l), MCA). In *Arneson-Nelson v. Nelson*, 2001 MT 242, 307 Mont. 60, 36 P.3d 874, we affirmed a lower court's amending a parenting plan to suspend the father's visitation rights. The court initially gave the mother primary custody and the father specific limited visitation based on his history of "verbally abusive altercations" with the mother, the court, and mediators. *Arneson-Nelson*, ¶¶ 7-12. The court also required the father to submit to anger management counselling. *Arneson-Nelson*, ¶ 12 (which we affirmed in a prior appeal). However, the court later amended the parenting plan to prohibit all physical contact with the child and allow contact only by telephone, email, or mail at the mother's sole discretion, based on expert testimony that the child was "seriously emotionally disturbed" by fear of his father and the parents' hostility toward each other. *Arneson-Nelson*, ¶¶ 18-19. Father challenged the lower court's finding that it was in the child's best interest to suspend his visitation and prohibit all physical contact as clearly erroneous. *Arneson-Nelson*, ¶¶ 20-21. We affirmed, holding that the court's findings were

17

supported by substantial evidence that contact with his father was emotionally disturbing for the child. *Arneson-Nelson*, ¶¶ 23-24, 28-29.

¶28 At trial, Heidi testified that Joseph's proposed 50/50 custody arrangement would place their then two-year-old child in imminent danger of physical, emotional, and psychological harm. Stepping through the § 40-4-212(1), MCA, criteria, the District Court determined, as pertinent, that:

(1) The wishes of the child's parent or parents as to custody. Heidi's proposed plan was in the child's best interests because it required Joseph "to successfully address his parenting deficiencies."

(2) The mental and physical health of all individuals involved. Joseph's conduct throughout the proceedings was "erratic" and the court was ordering a mental health evaluation.

(3) Chemical dependency or abuse on the part of either parent. Joseph had an alcohol and marijuana use problem about which "he [was] in denial."

(4) Whether the child has frequent and continuing contact with both parents, which is considered to be in the child's best interests unless the court determines that contact with a parent would be detrimental to the child's best interests. Again, Joseph's conduct was "erratic," and he had "a serious chemical dependency problem." It was not in the child's best interests "to have frequent and continuing contact with Joseph until [he] successfully addresse[d] his parenting deficiencies."

The court also separately found that: (1) "[d]uring the pendency of [the] dissolution Joseph's chemical dependency was obvious," and "[t]he evidence [was] overwhelming that Joseph has a chemical dependency problem"; (2) Joseph's communication and interaction with Heidi, recorded on the Our Family Wizard app and surveillance videos "all reflect[ed] extraordinary control and anger problems"; (3) "there [was] substantial evidence that Joseph needs to obtain a psychological evaluation based upon his conduct" and admission

18

that "he has controlling and anger issues"; and (4) Joseph's trial testimony denying any chemical dependency was "not credible." Based on these findings, the District Court determined that it was in the child's best interest to restrict Joseph's parenting time until he submitted to chemical dependency and mental health evaluations.

¶29 Notably, Joseph does not once assert that the parenting plan is not in his child's best interest. He also does not indicate whether he has in fact completed the court-ordered evaluations since entry of the August 2024 final parenting plan. Instead, he simply contends that the District Court permanently deprived him of his right to parent his daughter without providing any evidence or assertion that he actually tried to do so. Joseph's own conduct led the court to condition his ability to parent his child—submit to the court-ordered evaluations and Joseph may begin to exercise parenting time with the parties' child.

¶30 "Trial courts have broad discretion when considering the parenting of a child, and we must presume that the court carefully considered the evidence and made the correct decision." *Woerner v. Woerner*, 2014 MT 134, ¶ 12, 375 Mont. 153, 325 P.3d 1244 (citation omitted); *In re Kesler*, 2018 MT 231, ¶ 21, 392 Mont. 540, 427 P.3d 77. "Absent clearly erroneous findings, we will not disturb a district court's decision regarding parenting unless there is a clear abuse of discretion." *Woerner*, ¶ 12. We do not second-guess a lower court's determinations regarding witness credibility or the weight of evidence. *Lyndes v. Green*, 2014 MT 110, ¶ 15, 374 Mont. 510, 325 P.3d 1225.

¶31 Here, as in *Arneson-Nelson*, the District Court's factual findings were supported by substantial credible evidence, including Heidi's direct testimony; documentary evidence,

including the Yellowstone County Sheriff's Office surveillance footage and 3,800 pages of transcribed communications; and Joseph's own admissions in writing, and therefore not clearly erroneous. The court expressly found Joseph's contrary testimony not credible. The court did not exercise its discretion to limit Joseph's parental contact detrimental to the child's best interest based on erroneous findings of fact, nor was its parenting plan arbitrary, capricious, or exceeding the bounds of reason. We therefore hold that the District Court did not clearly abuse its discretion when it ordered a graduated parenting plan, the start of which was conditioned on Joseph's obtaining court-ordered chemical dependency and mental health evaluations.

¶32 *3. Did the District Court equitably distribute the parties' business when it awarded Heidi full ownership?*

¶33 Joseph does not contest the District Court's distribution of any property other than Boesh Engineering. And he contests the distribution of Boesh Engineering only on the ground that distributing it to Heidi violated "Montana's professional corporation statutes." Specifically, he argues that Heidi may not legally own or operate Boesh Engineering because she is not a professional engineer.

¶34 Before addressing the merits of Joseph's argument, we are compelled to address a preliminary matter relating to his claimed error. J.R. Boeshans Engineering, PLLC, was registered with the Montana Secretary of State on August 25, 2022. We take judicial notice pursuant to M. R. Evid. 201(b)-(c) of all public filings of record with the Secretary of State for this business. The August 25, 2022 Articles of Organization list Joseph and Heidi as managers and the business purpose as "any lawful business." Between the second and third

20

days of trial, on August 5, 2024, J.R. Boeshans Engineering, PLLC's registered agent (an attorney) filed "Articles of Correction" changing the listed purpose of the business from "any lawful business" to "rendering professional engineering services." *See* Montana Secretary of State Filing No. C1306598, Doc. No. 16251368/15325836 ("When we first filed the Articles, we listed the purpose of the business as 'any lawful business.' We would like to correct the purpose of the business to be 'rendering professional engineering services.'"). The timing and propriety of this "correction" is highly suspect.

¶35 Joseph cites to §§ 35-4-207 and -311, MCA, of the Montana Professional Corporation Act as authority for his claim that the District Court illegally awarded Heidi sole ownership of Boesh Engineering. As he points out, however, the business is registered as J.R. Boeshans Engineering, PLLC, a "professional limited liability company." Accordingly, Montana's Limited Liability Company Act, not Montana's Professional Corporation Act, controls. *See*, *e.g.*, § 35-4-206, MCA (a "professional corporation" formed under Title 35, chapter 4, "must contain the words 'professional corporation' or the abbreviation 'P.C.'" in the entity name); *compare* § 35-8-1302(1), MCA (naming requirements for a "professional limited liability company").

¶36 The Montana Limited Liability Company Act governs organization of "professional limited liability companies." Title 35, chapter 8, part 13, MCA. "At least one-half of the managers" of a PLLC "must be qualified persons with respect to the limited liability company." Section 35-8-1303, MCA. The Act defines a "qualified person" only as one "eligible under this chapter to own shares issued by a professional limited liability company." Section 35-8-102(27), MCA. "Members" of a PLLC may only be those who

21

are "authorized by law . . . to render a professional service permitted by the articles of organization of the professional limited liability company." Section 35-8-1304(1), MCA. Members may be "natural persons," "domestic or foreign professional corporations," other "professional limited liability companies," or "general partnerships . . . in which at least one partner is authorized by law . . . to render a professional service." Section 35-8-1304(1), MCA. A "professional service" is one "that may lawfully be rendered only by persons licensed under a licensing law of this state." Section 35-8-102(26), MCA; *see also* § 35-8-102(24), MCA (defining "person").

¶37    As pertinent here, Title 37, chapter 67, MCA, separately governs the "profession" of engineering. Section 37-67-301, MCA, provides that "a person . . . practicing or offering to practice engineering" in Montana must be "qualified to practice and . . . licensed," and that it is unlawful to practice, offer to practice, or "convey the impression" that one practices engineering if not licensed. *See also* §§ 37-67-101(7) and -102, MCA (defining the "practice of engineering").

¶38    Besides cursorily asserting that Heidi may not "legally own or operate a professional limited liability company engaged in engineering," Joseph does not explain exactly how or why Heidi is ineligible to receive Boesh Engineering under the final decree, or how awarding her ownership is illegal. Instead, he claims only that Heidi is "unqualified to provide professional services" because she is not a licensed engineer. First, we note that "rendering professional engineering services" only became the stated purpose of J.R. Boeshans Engineering, PLLC, on August 5, 2024—mid-trial and likely unbeknownst to

22

the District Court.[13]  Second, Heidi is a banker; she is not "practicing or offering to practice engineering" and is not "tending to convey the impression" that she is a professional engineer.  *See* § 37-67-301, MCA, *supra*.  No Montana law requires Heidi to be the licensed person who renders professional services for an engineering business to be awarded Boesh Engineering.  Heidi testified at trial that her business plan was to *hire* a professional engineer to render these services.  The District Court likewise found that Heidi "does not need to be an engineer to own an engineering business" but "would be required to hire" one.

¶39     Finally, the District Court's Final Decree is not the instrument effecting transfer of ownership of Boesh Engineering, nor does it prescribe exactly how the ownership transfer shall occur or strictly limit transfer to Heidi personally.  Heidi may certainly form a *new* business entity with her chosen professional engineer, if she has not done so already, and take ownership of the business through that entity, in full compliance with any pertinent law.  The final decree requires only that Heidi *receive* ownership, however that may be legally achieved.  We cannot conclude on this record that the District Court's awarding Boesh Engineering to Heidi violated Montana law.

¶40     Heidi contends that the District Court's award of Boesh Engineering should be analyzed under § 40-4-202, MCA, which governs equitable division of property in a divorce.  "A district court has broad discretion to apportion the marital estate in a manner

---

[13] No one mentioned the "correction" when trial resumed on August 9, 2024, and it is not noted anywhere in the record.

equitable to each party under the circumstances." *Hutchins v. Hutchins*, 2018 MT 275, ¶ 7,

393 Mont. 283, 430 P.3d 502. When apportioning property, the court shall consider:

> the duration of the marriage and prior marriage of either party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties, custodial provisions, whether the apportionment is in lieu of or in addition to maintenance, and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution or dissipation of value of the respective estates and the contribution of a spouse as a homemaker or to the family unit.

Section 40-4-202(1), MCA. "The district court's apportionment of the marital estate will stand unless there has been a clear abuse of discretion as manifested by a substantially inequitable division of the marital assets resulting in substantial injustice." *Richards v. Trussler*, 2015 MT 314, ¶ 11, 381 Mont. 357, 360 P.3d 1126. "We examine each case individually, with an eye to its unique circumstances." *Hutchins*, ¶ 7.

¶41 Here, the District Court had the unenviable task of equitably distributing a business the couple purchased together from Joseph's parents. However, they were only able to buy Boesh Engineering by first obtaining a HELOC to pay off Joseph's $35,000 in premarital credit card debt in order to qualify for financing, and then obtaining an SBA loan; both the HELOC and SBA were secured by Heidi's premarital home. At the time of trial, Heidi's home still secured the $100,000 HELOC and $532,000 owing on the SBA loan. Heidi was also still owed $25,000 for six-months' work getting Boesh Engineering operational after purchase. Heidi presented a reasonable business plan to assume full control of Boesh Engineering and liability for all its debt, including refinancing the SBA and removing Joseph as an obligor.

24

¶42　Joseph, on the other hand, proposed to retain sole ownership, pay Heidi $100,000 cash, and refinance the SBA loan to remove Heidi as an obligor and her home as collateral. But Joseph admitted he was broke with $46,000 in credit card debt and no valuable unencumbered assets; and uncontroverted evidence established that, since their separation, the bank had discontinued Boesh Engineering's line of credit. There was also a very real possibility, as the District Court expressly found, that Joseph could not successfully operate the business and would put Heidi's home at risk. It was within the province of the District Court to disbelieve Joseph's unsupported assertions that his credit was "amazing" and that he had "multiple people . . . willing to partner" with him to keep the business afloat. The court determined it was equitable to award Heidi the business and its debt because her and her children's home was on the line. Under these circumstances, this decision was not substantially inequitable or a clear abuse of the court's discretion.

## CONCLUSION

¶43　We hold the District Court's finding that Joseph failed to fully disclose his financials was not clearly erroneous. We further hold that the District Court did not abuse its discretion when it ordered a final parenting plan conditioning parenting time on Joseph's first submitting to chemical dependency and mental health evaluations, or when it awarded Heidi sole ownership of Boesh Engineering.

¶44　Affirmed.

/S/ KATHERINE M BIDEGARAY

We Concur:

/S/ CORY J. SWANSON

25

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE